Exhibit 1

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
-----------------------------------------------------------------------x

STUART PIVAR,                                                INDEX NO. *159592/2021*

               Plaintiff                Plaintiff's address:
                                                            15 W. 67th Street
   -against-                                              New York, New York
                                                            10023
THE VAN GOGH MUSEUM,

              Defendant.

-----------------------------------------------------------------------x

     **YOU ARE HEREBY SUMMONED**,  to answer the complaint in this action and

to serve a copy of your answer upon Plaintiff's Attorney(s) within twenty (20) days after

the service of this Summons, exclusive of the day of service (or within 30 days after the

service is complete if this summons is not personally delivered to you within the State of

New York); and in case of your failure to appear to answer, judgment will be taken

against you by default for the relief demanded in the complaint.

Dated:  New York, New York
        September 1, 2021

                               Yours, etc.

                               Law Offices of Mitchell Cantor
                               225 Broadway, Suite 1515
                               New York, NY  10007
                               (917) 621-5802

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
------------------------------------------------------------------------x

STUART PIVAR,

                              Plaintiff                                    Index No. *159592/2021*

          -against-                                                       COMPLAINT

THE VAN GOGH MUSEUM,

                              Defendant.

------------------------------------------------------------------------x

          Plaintiff Stuart Pivar, by his attorneys The Law Offices of Mitchell Cantor, 225

Broadway, Suite 1515, New York, NY  10007, complains of the Defendant as follows:

1. Plaintiff Stuart Pivar (henceforth "Plaintiff") is a natural person residing at 15 W. 67th
   Street, Apt. 4FW, New York, NY  10023.

2. Defendant The Van Gogh Museum  (henceforth "Defendant") is a Kingdom of the
   Netherlands foundation with a principal place of business located at Paulus Potterstraat
   7, Amsterdam, The Netherlands 1071 CX.

3. Plaintiff is a significant collector fine art.  On or about March 1, 2021 Plaintiff
   acquired the painting entitled Auvers, 1890 (Henceforth "Painting") which Plaintiff
   had every reason to believe was an authentic work of art created by Vincent Van
   Gogh.

4. On or about May 14, 2021 Plaintiff submitted an authentication request to the
   Defendant on the form provided by Defendant for the public to do so (henceforth the
   "Authentication Form") and in accordance therewith submitted electronic images of
   the Painting to the Defendant as per the Authentication Form and the Terms and

Conditions referenced therein. A copy of the Authentication Form is annexed hereto as "Exhibit A" and a copy of the Terms and Conditions is annexed hereto as "Exhibit B".

5.  Plaintiff sent Defendant numerous inquires in June and July 2021 by electronic mail concerning the status of the authentication request.  Defendant never responded to any of them.

6.  On or about August 13, 2021 Defendant provided Plaintiff with a report and with a letter stating unequivocally that the Painting was not an authentic work by Vincent Van Gogh.  A copy of the report is annexed hereto as "Exhibit C" and a copy of the letter is annexed hereto as "Exhibit D".

7.  At no time did the Defendant seek to view the actual Painting or engage the Plaintiff in obtaining scientific or forensic tests of the Painting's paint surface, canvas or other physical elements although at all relevant times herein the Plaintiff was ready, willing and able to send the Painting to Defendant for direct examination and offered on several occasions to do so.

8.  Defendant rejected the authenticity of the Painting after nothing more than a cursory review of electronic photographs emailed by Plaintiff to Defendant.

9.  The Painting would be one of Van Gogh's largest paintings if certified as authentic by the Defendant and on information and belief would have a present fair market value of $300,000,000.

10. Notwithstanding the foregoing, works of art attributed to Vincent Van Gogh but rejected as authentic by Defendant have only a nominal or decorative value.

11. By reason of the foregoing, the current fair market value of the Painting has been reduced from $300,000,000 to essentially nothing.

## AS AND FOR A FIRST CAUSE OF ACTION- NEGLIGENCE

12.  Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 11 as set forth herein.

13. Defendant had a duty to Plaintiff to use its best efforts and employ all due diligence when it agreed to examine and authenticate the Painting.

14. Defendant failed to discharge its duty to Plaintiff and issued a cursory, dismissive and perfunctory rejection of the Painting without requesting or obtaining any scientific or forensic tests and without even asking to view the actual Painting directly.

15. The general tone and nature of the report attached hereto as "Exhibit D" demonstrates that the Defendant had determined that the Painting was not authentic prior to examining the submissions provided by Plaintiff and that Defendant consequently rejected every option available to Defendant to reach a different conclusion.

16. Defendant's actions therefore constituted negligence as a matter of law.

17. Had Defendant opinioned that the Painting was authentic the Painting would have had a fair market value of $300,000,000.

18. The Painting now has only a nominal value because Defendant has opinioned that the Painting is not authentic.

19. Plaintiff has therefore been damaged in an amount to be determined at trial of at least $300,000,000.

## AS AND FOR A SECOND CAUSE OF ACTION – BREACH OF CONTRACT

20. Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 11 and 13 through 19 as if more fully set forth herein.

21. Paragraph 3.1 of Defendant's Terms and Conditions, annexed hereto as "Exhibit B", require the Defendant to exercise *"the due care expected of a good contracting party"*.

22. Defendant breached its obligation to Plaintiff as set forth in Paragraph 3.1 of its Terms and Conditions by issuing a cursory, dismissive and perfunctory rejection of the Painting without requesting or obtaining any scientific or forensic tests and without even requesting to view the actual Painting directly.

23. The general tone and nature of the report attached hereto as "Exhibit D" demonstrates that the Defendant had determined that the Painting was not authentic prior to examining the submissions provided by Plaintiff and that Defendant consequently rejected every option available to Defendant to reach a different conclusion.

24. Defendant therefore breached its contractual obligation to Plaintiff by issuing a cursory, dismissive and perfunctory rejection of the Painting.

25. Had Defendant opinioned that the Painting was authentic the Painting would have had a fair market value of $300,000,000.

26. The Painting now has only a nominal value because Defendant has opinioned that the Painting is not authentic.

27. Plaintiff has therefore been damaged in an amount to be determined at trial of at least $300,000,000.

WHEREFORE, IT IS RESPECTFULLY REQUESTED THAT THIS COURT GRANT PLAINTIFF JUDGMENT:  (a) On Plaintiff's First Cause of Action in an amount to be determined at trial but in no event less than $300,000,000; (b) On Plaintiff's Second Cause of Action in an amount to be determined at trial but in no event less than $300,000,000; (c) for

Plaintiff's legal fees, costs, disbursements and expenses and (d) for such other and further relief

as this Court deems just and proper.


Dated:  New York, New York
           August 31, 2021


                                     Yours, etc.

                                       The Law Offices of Mitchell Cantor
                                       225 Broadway, Suite 1515
                                       New York, NY  10007
                                       (917) 621-5802
                                       mc@mcantorlawoffice.com

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

------------------------------------------------------------------x

STUART PIVAR

                Plaintiff,

   -against-

                                            Index No. 159592/2021

THE VAN GOGH MUSEUM,

                Defendants.

------------------------------------------------------------------x

### VERIFICATION

STATE OF NEW YORK    )
                        ) ss:
COUNTY OF NEW YORK  )

    STUART PIVAR, being duly sworn, deposes and says:

    I am the plaintiff herein, have read the annexed complaint and know the contents

thereof and the same are true to my knowledge, except as to those matters which are

stated to be alleged on information and belief, and as to those matters I believe them to be

true.

                                    STUART PIVAR

Sworn to before me this
___ day of August, 2021

EXHIBIT A



**AUTHENTICATION REQUEST**

We can only process this request if you are the owner of the work in question.

Your request is subject to our General Terms and Conditions of the Van Gogh Museum Foundation for purposes of Researching Authenticity (hereinafter referred to as *General Terms and Conditions Researching Authenticity*) and our *Privacy Statement*. These documents are attached with this request.

By signing this doument, you acknowledge that you are familiar with and consent to the *General Terms and Conditions Researching Authenticity* and the processing of your personal details in the manner set out in the *Privacy Statement*.

Name: Stuart Pivar ....................................................................................................

Address: 15 West 67th Street, Apt. 4FW ..................................................................

City: New York, NY 10023 ........................................................................................

Country: United States ..............................................................................................

E-mail address: spivar67@gmail.com or maggie@pivarcollection.com ...................

=================================================================

Type of work (e.g. painting, drawing, print): Painting (oil on canvas) .....................

Title of work: *Auvers*, 1890 ....................................................................................

Dimensions: 36 x 36 in. (91.4 x 91.4 cm.) ...............................................................

Date of acquisition of the work: 3/1/2021 ................................................................

Provenance information: Collection Jonas Netter .....................................................

=================================================================

Place: 15 West 67th Street
New York, NY 10023 .................          Date: 6/1/21 ....................................

Signature: .................................

EXHIBIT B



**GENERAL TERMS AND CONDITIONS OF THE VAN GOGH MUSEUM FOUNDATION FOR PURPOSES OF RESEARCHING AUTHENTICITY**

The Van Gogh Museum Foundation has its registered office in Amsterdam, the Netherlands (postcode 1071 CX) at Paulus Potterstraat 7, and is registered with the Chamber of Commerce for Amsterdam under number 41213987.

1.  **DEFINITIONS AND APPLICABILITY**

1.1     In these general terms and conditions, the following terms have the following meanings:
- Terms and Conditions: these terms and conditions for purposes of researching authenticity and other services related thereto;
- VGM: Van Gogh Museum Foundation;
- Client: a natural person or legal entity or partnership that is party to or involved in an act or legal act referred to in article 1.2 of these Terms and Conditions, or the party addressed by the act or legal act referred to in that article or the party making a request referred to there;
- Work: painting, drawing, print or letter belonging to the Client which the Client suspects may have been made or written by Vincent van Gogh;
- Research: research by VGM into the authenticity of the Work;
- Website: www.vangoghmuseum.com

1.2     The Terms and Conditions apply to all services (including Research to be conducted by VGM) provided by VGM to the Client, to all agreements between VGM and the Client, as well as to any request from the Client to provide services, regardless of whether an agreement is or has been concluded between VGM and the Client.

1.3     VGM will ensure that these Terms and Conditions are made available to the Client before conclusion of the agreement or on its conclusion, either in electronic (digital) form or otherwise. The Client is itself responsible, if desired, for saving, storing and printing the Terms and Conditions and the agreement on a durable data carrier using the facilities available on the Website for this purpose, and for the permanent accessibility of the stored copy.

1.4     Notwithstanding any statutory obligations that might be incumbent on VGM to keep the agreement and/or the Terms and Conditions, VGM is not obliged to keep the agreement and/or the Terms and Conditions that it has on file accessible to the Client at all times.

1.5     Any general terms and conditions or other conditions of the Client are not applicable. The Client may only invoke different and/or additional stipulations if and to the extent that they have been accepted by VGM in writing. Such different and/or additional provisions do not alter the applicability of the other provisions in these Terms and Conditions and they apply solely to the agreement for which they were specifically and explicitly agreed in writing.

2. **FORMATION OF THE AGREEMENT**

2.1    Communications by VGM on the Website relating to making services available should be regarded as an invitation to make an offer. The agreement is formed by VGM's confirmation of the Client's request, on the proviso that all agreements are formed on the condition precedent that all details necessary for the Research stated in articles 4.2 and – if applicable – 4.3 of these Terms and Conditions, have been put into the possession of VGM and also meet the requirements set by VGM in this regard.

3. **SUBJECT MATTER AND PERFORMANCE OF THE AGREEMENT**

3.1    In providing the services (including the Research to be conducted by VGM) VGM will exercise the due care expected of a good contracting party, while VGM's obligations will have the nature of best efforts obligations. The outcome of the Research is no more than an opinion of VGM; VGM therefore does not guarantee the outcome of the Research, which therefore means that whether or not VGM is of the opinion that the Work is authentic, this cannot be deemed to be a guarantee, but merely an opinion, as stated above.

3.2    VGM's Research will consist in the first place of an assessment of the request as stated in article 2.1 of these Terms and Conditions and the details stated in article 4.2 and – if applicable – article 4.3 of these Terms and Conditions. VGM will endeavour to make the outcome of the Research known to the Client in writing within at most 3 (three) months after receipt of the aforementioned details.

3.3    If, after having studied the request referred to in article 2.1 and the details referred to in article 4.2 and – if applicable – article 4.3 of these Terms and Conditions, VGM sees a reason to conduct further Research into the Work, then VGM – in departure from article 3.2 of these Terms and Conditions – will not make the outcome of the Research known, but will send the Client a written request asking it to forward the Work. At the same time VGM will inform the Client in writing of when it will study the Work in further detail and what the Client can expect of VGM. VGM will endeavour to make the outcome of the Research known to the Client in writing within at most 3 (three) months after receipt of the aforementioned details. Moreover, VGM will endeavour to make the outcome of the Research known to the Client in writing within 4 (four) months after receipt of the Work. If, after VGM has received and inspected the Work, it becomes evident that, in the assessment of VGM, highly specific and/or time-consuming Research is necessary, VGM will consult with the Client as to the planning of that Research.

3.4    VGM will conduct no further correspondence with the Client about the outcome of the Research unless the Client sends new information and details to VGM, this in the assessment of VGM.

3.5    The time periods referred to in articles 3.2 and 3.3 of these Terms and Conditions are only approximate and never apply as final deadlines. If, for any reason whatsoever, the time periods are exceeded, this does not entitle the Client to suspend performance of any obligation it has to VGM, nor does it entitle the Client to compensation.

3.6    All assignments are solely accepted and carried out by VGM with the exclusion of Sections 7:404 and 7:407(2) of the Dutch Civil Code ("DCC").

3.7    VGM is at all times permitted to engage third parties in performing the agreement.

4.  **OBLIGATIONS OF THE CLIENT AND INDEMNIFICATION**

4.1  The Client guarantees that the information and details furnished to VGM by him or on his behalf are correct, complete and reliable. The Client furthermore guarantees that he is the owner of the Work.

4.2  The Client must at least furnish to VGM sharp, colour photographs of 20 by 25 cm, made in conformity with the guidelines for photography stated on VGM's Website, showing:
     (i)    the front of the Work without frame;
     (ii)   the back of the Work with frame;
     (iii)  close-ups of any annotations and/or signatures on the front of the Work;
     (iv)   close-ups of any annotations and/or signatures on the back of the Work.

4.3  If the Client wishes to furnish other information and details to VGM in addition to the colour photographs referred to in article 4.2 of these Terms and Conditions, it must state this explicitly and in writing.

4.4  The Client must print out the information and details referred to in articles 4.2 and – if applicable – 4.3 of these Terms and Conditions in duplicate and put them on a USB flash drive and send them by post to the following address: Van Gogh Museum Foundation, Department of Collections, Research and Presentation, PO Box 75366, 1070 AJ AMSTERDAM, the Netherlands.

4.5  If the Client does not furnish the information and details referred to in articles 4.2 and – if applicable – 4.3 of these Terms and Conditions or does not do so properly, in VGM's assessment, VGM will inform the Client of this as soon as possible.

4.6  If the Work is sent to VGM for Research, the Client is obliged – if it has not already done so – to conclude insurance including goods in transit insurance for the Work covering, among other things, damage, fire, loss and theft. At VGM's request, the Client must furnish a copy of the policy schedule to VGM.

4.7  The Client indemnifies VGM against all third-party claims in connection with the agreement between VGM and the Client and/or its performance.

5.  **PAYMENT**

5.1  The Client does not owe VGM any fee.

5.2  VGM will inform the Client in good time of possible extra Research costs and will discuss them with the Client.

5.3  Payment of any expenses and possible extra Research costs must be made by deposit or remittance to a bank account designated by VGM within 14 (fourteen) days of the invoice date.

6.  **DURATION AND TERMINATION OF AGREEMENT**

6.1  The agreement between VGM and the Client is concluded for an indefinite period, unless it follows from the content, nature and purport of the agreement that it was concluded for a specific period or that it ends after the agreed services have been performed.

6.2   VGM and the Client are at all times entitled to terminate the agreement prematurely with immediate effect.

6.3   After termination of the agreement, all claims of VGM against the Client on any basis whatsoever will become immediately due and payable without any further demand or notice of default, and articles 3.4, 4.7, 7, 8 and 11 of these Terms and Conditions will remain in full force.

7.   **LIABILITY**

7.1   VGM is not liable for damage arising from the fact that the Client furnished incorrect, incomplete or unreliable information or details to VGM. Nor is VGM liable for damage that may be attributed to an act or omission, other than that referred to in the preceding sentence, on the part of the Client or a third party enlisted by or on the instructions of the Client.

7.2   VGM is not liable for damage as a result of (i) its failure to perform with respect to the Client, regardless of whether this is attributable or not, or for damage resulting from (ii) tort towards the Client, unless the damage was caused by intent or deliberate recklessness on the part of VGM's management or subordinate managers who are members of the company management.

7.3   In no case is VGM liable for trading losses, consequential losses and/or indirect damage sustained by the Client.

7.4   Without prejudice to the foregoing provisions, VGM's liability is in all cases limited to the amount that is covered by VGM's liability insurance and that is actually paid out in the case concerned.

7.5   The provisions of this article also apply with regard to any third parties involved by VGM in the agreement or its performance.

8.   **INTELLECTUAL PROPERTY RIGHTS**

8.1   All intellectual property rights relating to the services provided by VGM remain the property of VGM or – if applicable – of the third party which authorised VGM to make available all or part of these services to the Client, and they accrue solely to VGM or – if applicable – to the third party described hereinbefore. This includes copyrights, trade mark rights, patent rights, design rights, trade name rights, database rights and neighbouring rights, as well as rights to know-how and performances on a par with a patentable invention. VGM therefore reserves all intellectual property rights relating to the outcome of VGM's Research, whether worked out in detail or not, including reports, analyses, working methods and so on, in connection with the agreement to be performed by it on the Client's behalf.

8.2   VGM is free to use the image of the Work and the Research it has conducted for scientific purposes, including publication and reproduction; in such a case the Client will always remain anonymous, unless other arrangements have been made with the Client.

8.3   VGM is at liberty to pass on the outcome of the Research to a new owner if the new owner proves not to be aware of the opinion given earlier by VGM.

8.4   If a public discussion of the Work in question has been started by the Client, the museum may present VGM's opinion publicly.

9.    **REPORTING COMPLAINTS**

9.1    If the Client is not satisfied or has questions about the manner in which VGM is performing, or has performed, the agreement, the Client may report its complaint or pose its question, formulated completely and clearly, within a reasonable period of time to: Van Gogh Museum Foundation, Department of Collections, Research and Presentation, PO Box 75366, 1070 AJ AMSTERDAM, the Netherlands. VGM's Department of Collections, Research and Presentation can also be reached via research@vangoghmuseum.nl  or +31 20 570 5200.

9.2    VGM's Art Department will endeavour to reply to complaints or questions within a period of 4 (four) weeks after the day of receiving them. If a complaint or a question requires a foreseeably longer period for reply, VGM's Art Department will send the Client a notice of receipt of the complaint or question within the stated period of time. This notice will also contain an indication of the period within which the Client can expect a more comprehensive reply.

10.    **MISCELLANEOUS PROVISIONS**

10.1    If one of the provisions in these Terms and Conditions is found to be invalid, null and void or non-binding, this does not affect the validity of the other provisions. In the event that one or more provisions are/become invalid, null and void or non-binding, VGM and the Client will agree replacement provisions that are valid and that most closely approximate the content and purport of the invalid, null and void or non-binding provision(s).

10.2    The rights and obligations in these Terms and Conditions accruing to the Client are non-transferable unless this has been stipulated in so many words in these Terms and Conditions or has been explicitly agreed in writing with VGM.

10.3    Any changes or additions to any provision in these Terms and Conditions are only valid if they have been agreed by VGM and the Client in writing.

10.4    The titles and chapters in these Terms and Conditions serve solely for ease of reading and do not affect the content or meaning of the provisions in these Terms and Conditions.

10.5    All communication between VGM and the Client may take place electronically, unless the Terms and Conditions and/or the agreement and/or the law explicitly prescribe otherwise. Written communication is therefore deemed to include electronic communication.

11.    **CHOICE OF LAW AND FORUM**

11.1    These Terms and Conditions and all obligations arising therefrom or extra-contractual obligations related thereto are governed by Dutch law, with the exception of the Dutch private international law rules on the conflict of laws.

11.2    To the extent that national or international rules of law do not mandatorily provide otherwise, any disputes in the matter of or arising from or related to these Terms and Conditions or the contractual and extra-contractual obligations arising therefrom or related thereto will solely be submitted for settlement to the competent court in Amsterdam.

These Terms and Conditions have been filed at the office of the Amsterdam Chamber of Commerce under number 41213987. The version most recently filed there is always the applicable version.

...

EXHIBIT C





# Art Historical Report

## ATR-006857

*Auvers*

oil on canvas, 91.4 x 91.4 cm,

private collection

Verso: handwritten label attached to the stretcher with the following text:
'Propriétaire: Jonas Netter/ 'Vincent van Gogh - Auvers 1890' (figs. 1 & 2). The
name 'Vincent' is also written on the back of the canvas, with a vaguely visible
'1890' below it (fig. 3).



The painting *Auvers* is not included in any of the oeuvre catalogues of Vincent van Gogh. According to reports of the owner and the scholarly opinion of Dr. Michael P. Mezzatesta it is a so far unknown, and now re-discovered painting attributed to Vincent van Gogh.[1] Our comments on their arguments are given below, segmented under the headings: provenance, motif, materials used, technique and style, and signature.

## Provenance

As far as we know, the history of the painting *Auvers* does not go back to Van Gogh or his family. The work is not mentioned in his letters, nor described in any of the family documents. In fact, its provenance is difficult to trace. We also do not know when it was discovered; it seems to have been acquired by the present owner only very recently, namely in 2021, together with thirteen paintings attributed to other artists. It is suggested by the works themselves that they were at some point looted by the Nazis, because nine of them, including *Auvers*, bear stamps on the stretcher of an eagle above a swastika (fig. 4).[2] The handwritten label on the back, with the name of the owner Jonas Netter (1867-1946), appears to be old (fig. 2), but whether this Jewish businessman and Paris based collector of modern art did actually own this picture, or any of all the other ones, as is suggested in the brochure *Re-discovered Masterpieces*, is difficult to determine with certainty.[3] At least, no documents have been provided to make this suggestion likely, or better, a hard fact.

Netter's collection mainly consisted of paintings by Modigliani, Soutine, Utrillo, Kisling, Valadon, and several other artists active in the first decennia of the 20th century, most of whom Netter also knew personally.[4] He is not known to have ever owned a Van Gogh picture, and the well-known late nineteenth century impressionists seemed to have been out of his league when he started collecting

---

[1] In the following we have based ourselves on the information provide to us by the current owner, consisting of the brochure *Re-discovered Masterpieces*, the *Scholarly opinion* of Dr. Michael P. Mezzatesta, dated 30 April 2021, and a separate *Report*, with no author or date mentioned.
[2] 'These recently discovered fourteen paintings were exported from Nazi Germany or France', see *Re-discovered Masterpieces*, op. cit. (note 1), p. 3. The date of acquisition was communicated to us as 3 January 2021.
[3] It is suggested that all paintings were part of Jonas Netter's collection, although only the 'Auvers' painting has a direct reference to Netter, see *Re-discovered Masterpieces* (note 1), p. 3.
[4] For Netter's collection, see See Marc Restellini, *La collection Jonas Netter: Modigliani, Soutine et l'aventure de Montparnasse*, Paris 2012.



around 1915.[5] Puzzling is also the fact that Netter, although being Jewish and living in Paris during the German Occupation, had sold most of his collection already before the second World War, and what remained in his possession does not seem to have been confiscated by the Nazis. In fact, his only two children never knew much about his collecting activities, and 'thanks to excellent false documents, he led a quasi-clandestine life' during the occupation.[6] In the archives of the Einsatzstab Reichsleiter Rosenberg, responsible for the looting of Jewish property in occupied Paris, there is no reference to him, nor does he appear to have claimed any lost artworks after the war.[7] Furthermore, we lack any information on the whereabouts of the collection between the alleged moment of confiscation by the Nazis and its recent acquisition by the current owner; no information has been provided by the owner where they come from.

With the above in mind, it becomes difficult to explain the Nazi stamps on the paintings. There are even two on the back of *Auvers* (fig. 1 & 4), and similar ones on the back of eight other works. They all appear crude and vague, while the text is completely illegible, which is strange. In the brochure these stamps are without any hesitation described as a 'Nazi government export seal',[8] but the falsifying of Nazi stamps was already a widely spread activity during the war, and we think it would be wise to have these stamps researched by fully acknowledged experts in this field.

---

[5] Although Netter owned some smaller works by Corot, Toulouse-Lautrec, Renoir and Signac, the impressionists were 'hors de sa portée financière' (out of his financial reach), see Restellini 2012, op. cit. (note 4), pp. 11, 18. 'Netter admired the wonderful and popular impressionists of the late nineteenth century, but they had become too expensive', according to Stanley Meiser, *Shocking Paris: Soutine, Chagall and the Outsiders of Montparnasse*, London 2015, p. 26. From all the other artists mentioned in the brochure *Re-discovered Masterpieces*, op. cit. (note 1), Manet, Pissarro, Monet, Degas, Cézanne, Claus, Klimt, Derain, Braque and Kirchner, only Derain appears to have been represented with three works in Netter's collection, not with a harbour scene, but with 'a male nude, a still life, and a figure painting' ('un nu, une nature morte, et une figure'), see G.J. Gros, 'Les grands collectionneurs. Chez M. J. Netter', in *l'Art Vivant*, no 97, January 1929, pp. 14-15, reproduced in Restellini 2012, op. cit. (note 4), p. 18.
[6] 'Sous la Occupation, il reste vivre à Paris. Grâce à des vrais faux papiers, il mène une existence quasi-clandestine', see Restellini 2012, op. cit. (note 4), p. 11. Netter never used his first name Jonas, and was known as either 'Jones' of 'Jean' Netter, *idem*, p. 13.
[7] For the cultural plunder of the Einsatzstab Rosenberg, see the website https://www.errproject.org/.
[8] *Re-discovered Masterpieces*, op. cit. (note 1), p. 3.



It is a mystery why a wax seal with the sign of the Holy Cross interlaced with the letter 'M' was at some point added to the stretcher (figs. 1 & 5). It is the emblem of 'Saint Mary under the Cross', also called the 'Miracle Medal', and goes back to the visions of the nun Cathérine Labouré (1806-1876), who during one of her visions in 1830 was ordered to coin a medal with this design, which she did two years later (fig. 6). In 1947 she was beatified as Sainte Cathérine Labouré by pope Pius XII. The symbol itself is far from exceptional and widely known in the catholic world, so in this particular situation, the wax seal is impossible to connect to any individual person, or institute for that matter.

## Motif

Although the handwritten label attached to the stretcher describes the location of the landscape as 'Auvers', this cannot be the case. The painted view is not even remotely reminiscent of the village and surroundings of Auvers-sur-Oise where the artist spent the last two months of his life (figs. 7-9). First of all, the village never had a weirdly curved road that crosses the railway at two different locations. Furthermore, the railway station has never changed much over the years, and has nothing in common with the one in the painting (fig. 10), and perhaps most notably, Auvers stretches out along the north bank of the river Oise for about 4.5 kilometers, so one would at least expect the river Oise present in any wide angled bird's eye view perspective, but it failed to make the painting.

The particular viewpoint leads to another problem: it is simply impossible to take up such a high position anywhere near Auvers, except way up in the air with a helicopter. There are no mountains in the area, which also means that the bare rock formation on the horizon is just as unfitting to the actual site as the rest of the image. In fact, the view is not reminiscent of any site Van Gogh visited in France in the last four years of his life. In addition, the combination of treeless, barren mountains from the ground onwards, fertile wheatfields without any green bushes, and trees only present along road paths, makes it very likely that the view depicted is a fantasized, fictional landscape.



## Materials used

According to Dr. Mezzatesta, *Auvers* is 'painted on a coarse burlap canvas consistent with those used by Van Gogh late in his career'.[9] However, he is mistaken. Without saying this in so many words, he refers to Van Gogh's documented and unique use of burlap/jute in Arles, in the fall of 1888, when Gauguin visited him. It was the latter who bought a 20 meter long piece of jute, 'toile à voile' (sailcloth) as Van Gogh called it, which they both used up within two months' time.[10] The weave pattern of the rough canvas of *Auvers* is completely different from the type used by both artists in Arles (fig. 11 & 12), and in addition to this we would also like to point out that Van Gogh never painted on such a coarse canvas again.[11] In Auvers-sur-Oise Van Gogh almost exclusively used readymade pre-primed canvasses from rolls he ordered in Paris, and the exceptions are not comparable to the burlap of the painting in question.

Furthermore, *Auvers* measures 91.4 x 91.4 cm, and this non-standard square format has no parallel in his entire oeuvre. In fact, the use of square formats is somewhat exceptional in Van Gogh's oeuvre, and in Auvers limited to a couple of heads, a still life and a garden view, all done on a modest scale, c. 50 x 50 cm.[12]

## Style & technique

Dr. Mezzatesta was struck by 'the draftmanship, rich impasto and unique colour or palette' of the painting, which in his view were 'instantly recognizable as the work of Van Gogh', but he does not really go into detail, and loosely compares the painting with seven Van Gogh paintings from Arles, and only two from Auvers. However, we note that there is very little variety in brushstrokes. The wheatfields were muddled together with a mix of colours in a straight linear fashion, which resulted in an overall naïve patchwork design of angular shaped plots of land. The simplistic buildings bordering the roads and fields were rendered in a lifeless daubing manner, with a curious multicolour mix of blue, red, green, orange or

---

[9] See *Scholary opinion*, op. cit. (note 1), p. 1.
[10] Letter 721, 19 November 1888. Gauguin called it 'toile à sac', sack-cloth, letter 716, 1 or 2 November 1888. See also D. Druick, P. Kort Zegers, *Van Gogh and Gauguin. The Studio of the South*, exh. cat. Chicago (The Art Institute of Chicago), Amsterdam (Van Gogh Museum), 2002, pp. 361-69.
[11] Pigment research has not been done, but if a separate, technical report will be made by acknowledged experts, we are of course prepared to judge the outcomes of it.
[12] For instance F 786 JH 2036, F 764 JH 2045, F 785 JH 2057, and F 756 JH 2029.



white walls, with either red, blue or yellow roofing. In our opinion there could hardly be a starker contrast between this way of painting and Van Gogh's lively, varied, often clear graphical brushwork, with a wealth of individually recognizable brushstrokes, and his focus on colour harmonies and contrasts.

This becomes even more evident when *Auvers* is placed next to a painting like *View of les Vessenots, Auvers* (figs. 14-16), which may very well function as a *pars pro toto* of Van Gogh's late style in Auvers. The houses in this painting, for instance, are not square boxes, but were constructed with diagonal brushstrokes for the roofs, straight strokes for the walls, in a further undulating style following the structure of the buildings themselves; not by squeezing in some colour between straight dark contours as in *Auvers*. Note the loose, freely and speedily executed fields in the foreground, with wavily lines and pointillist touches of yellow for the numerous flowers, and the variation between thicker and smaller brushstrokes to distinguish the foreground from the middle and background: the contrast with the stiff, hardly variable brushwork of *Auvers* could not be larger. And lastly, the way the trees were painted, says it all: in Auvers, Van Gogh developed a habit to paint trees in the distance by simply grouping curly brushstrokes into a closed rounded shape, whereas the trees lining the roads in the *Auvers* painting show no such circular structure at all; instead they were depicted as spidery skeletons with thin brown trunks and randomly placed splashes of green for foliage.

From what we further know of Van Gogh's working practice in Auvers, there is also an anomaly in the choice of format and subject matter, in combination with the type of canvas used by the maker of *Auvers*. In the case of ambitious, large pictures, Van Gogh almost exclusively used readymade pre-primed canvasses from rolls he ordered in Paris, and typical for the Auvers-period, if he wanted to stress the expanse of a landscape, he opted for a so-called 'double-square' format: 50 x 100 cm.

Furthermore, if *Auvers* is a wholly imagined, fantasized view, it has no parallel in Van Gogh's oeuvre, and if it is based to some extent on reality, which we think is very unlikely, as mentioned above, it has nothing in common with his kind of realism, which is grounded on working in front of the motif and much more true to life, also in terms of the perspective used. We know that there are some paintings by his hand in which he seems to have made use of a similar, fantasized high-up view. The first one is a painting from Arles, *Le canal Roubine du roi* (fig. 13), but although it looks as if the spectator hovers over the canal, the motif was studied with both feet flat on the ground. The effect Van Gogh aimed for was a



close up of the canal, looking downwards in front of the motif (on top of the bank of this canal just outside the city), while he depicted a topographically correct horizon above it, looking straight forward. Thus he deliberately flattened the perspective, for which he had found inspiration in Japanese woodblock prints.[13] Unlike *Auvers* the motif is thus not shown from high up in the air, and the same is true for two small Saint-Rémy paintings from high vantage points, a view of a valley (fig. 17) and an olive grove (fig. 18). Although he may have exaggerated the steepness a little in both works, they are painted from a spot he could reach, in the mountains of the Alpilles that border Saint-Rémy.

## Signature

In Dr. Mezzatesta's view the signature "Vincent" on the back of the canvas is 'in an entirely credible hand' and the hardly visible date "1890" appears to him 'rendered in the fugitive walnut brown ink typical of many of van Gogh's drawings' (fig. 3). Firstly, Van Gogh's signature is easily forged, and over the years we came across many examples. Besides this, Van Gogh never used a fugitive walnut brown ink for his drawings, but black inks that tended to fade over time to brownish tints due to the exposure to light, a circumstance hardly applicable to the verso of a painting. And lastly, not only was Van Gogh generally speaking reluctant in signing his work, it was certainly not his habit to sign and/or date his paintings on the back of a canvas.

## Conclusion

In our opinion *Auvers* is not an authentic painting by Vincent van Gogh. None of the conclusions in the separate headings above point to Van Gogh as the author of *Auvers*. The provenance does not lead back to the artist, his family, friends or acquaintances; the view has nothing in common with Auvers, nor have we found parallels in style and technique in Van Gogh's oeuvre, or in the canvas that was used, while the signature on the back, in view of the above, cannot be by him.

Teio Meedendorp, Louis van Tilborgh - Senior Researchers

July 2021
Van Gogh Museum, Amsterdam

---

[13] See T. Meedendorp, 'Van Gogh's topography - (a little bit) true to nature', in T.J. Standring, L. van Tilborgh, *Becoming Van Gogh*, exh. cat. Denver (Denver Art Museum), 2012, pp. 89-117, esp. pp. 108-9.



**Illustrations**



Fig. 1 - Verso of *Auvers*.





Fig. 2 - Label on the stretcher. Note the apparently very well preserved canvas, a coarse burlap with a horizontally as well as vertically double threaded weave pattern.



Fig. 3 - Detail of the verso with a signature 'Vincent' and only vaguely visible below '1890'.





Fig. 4 - Stamp showing the *Reichsadler* with an illegible text - on the stretcher of *Auvers*.



fig. 5 - Wax seal on the stretcher, showing the emblem of the Miracle Medal of Sainte Cathérine Labouré.



Fig. 6 - The Miracle Medal of Sainte Cathérine Labouré.





Fig. 7 - Auvers-sur-Oise, detail Google maps, satellite view.



Fig. 8 - Auvers c. 1860





Fig. 9 - Panoramic view of Auvers-sur-Oise, with the Oise river in the foreground and the railway station in the center, postcard 1960's.



Fig. 10 - Postcard railway station Auvers, c. 1900





Fig. 11 - Detail of fig. 2: note the apparently very well preserved canvas, a coarse burlap with a horizontally as well as vertically double threaded weave pattern.



Fig. 12 - Enlarged detail of the lower left edge of Van Gogh's painting *Gauguin's chair*, November 1888 (Van Gogh Museum, Amsterdam), painted on jute. Note the single thread weave pattern.



Fig. 13 - Vincent van Gogh, *Le canal Roubine du roi*, June 1888, oil on canvas, 74 x 60 cm, private collection.





Fig. 14 - Vincent van Gogh, *View of les Vessenots, Auvers*, June 1890, 55 x 65 cm, Museo Thyssen-Bornemisza, Madrid



Fig. 15 - detail fig. 14.





Fig. 18 - Vincent van Gogh, *Olive Trees on a Hill Side*, October 1889, 33.4 x 40.2 cm, Van Gogh Museum, Amsterdam

EXHIBIT D



Mr. S. Pivar
15 West 67th Street
Apt. 4FW
NEW YORK, NY 10023
U.S.A.

Visting address
Gabriël Metsustraat 8
1071 EA  Amsterdam

| Date | Reference | Subject |
|------|-----------|---------|
| 13 August 2021 | ATR-006857 | Request for authentication |

Dear Mr. Pivar,

With reference to the *General Terms and Conditions for Authentication* and the *Privacy Declaration* set out on our website and in the digital authentication request dated 14 May 2021, I hereby inform you of the following.

In his *Scholarly opinion* on your 'newly re-discovered painting attributed to Vincent van Gogh' (dated 30 April 2021), Dr. Michael P. Mezzatesta suggests that the painting *Auvers* should despite his own attribution be visually inspected and closely examined 'by qualified professionals in a museum setting.' Although you have asked us to give our opinion on his qualification of the work as authentic, we do not believe that an inspection *in situ* in our museum is necessary. In our opinion it is evidently clear from the material presented to us, that the painting *Auvers* cannot be attributed to Vincent van Gogh (please see the attached report with our considerations).

Normally your painting would fall in the category of works we do not fully comment upon after having reviewed the photographic images and general documentation. It is not unusual in the professional field of Art History to assess an attribution on the basis of photographs and historical documentation alone, and the Van Gogh Museum agrees with this generally accepted practice. In this case the rejected work is in our opinion stylistically, iconographically or technically (or a combination thereof) clearly too far removed from Van Gogh's own work that research and further discussion is deemed pointless.

In your case we decided to explain our opinion, because of all the attention already generated at forehand by the public presentation of the painting as a re-discovered work of Vincent van GoghIn the case of questions by the press, we will refer to you for the content of our report. If you decide to bring out the results of the report out into the open, we have no

Van Gogh Museum
Postbus / P.O. Box 75366
1070 AJ Amsterdam

T +31 (0)20 570 52 00
F +31 (0)20 570 52 22
www.vangoghmuseum.nl

1/2



objection, but we would like to know this in advance, so we can address the press ourselves appropriately - when being asked.

We trust that this information is helpful.

Yours faithfully,

Marije Vellekoop
Head of Collections and Research