UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

STUART PIVAR,

        Plaintiff,

    vs.

THE VAN GOGH MUSEUM,

        Defendant

Civ. A. No. 1:21-cv-09362-LLS

### <u>MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS</u>

FOLKMAN LLC
Theodore J. Folkman (pro hac vice)
53 State St., Suite 500
Boston, MA 02109
Tel. (617) 219-9664
Fax (857) 336-0206
ted@folkman.law

STONE LAW GROUP PLLC
Ralph M. Stone (RS-4488)
1700 Broadway, 41st Floor
New York, NY 10019
Tel. (212) 292-5690
Fax (212) 292-5680

*Attorneys for the Defendant*

Dated: December 21, 2021

## TABLE OF CONTENTS

Table of Authorities ............................................................................................................ ii

Preliminary Statement ......................................................................................................... 1

Facts .................................................................................................................................... 1

    A.   The Van Gogh Museum. ............................................................................................ 1

    B.   Stuart Pivar and *Auvers, 1890.* ............................................................................... 2

Argument ............................................................................................................................. 8

    A.   The Court Should Dismiss The Case Under The Doctrine of *Forum Non Conveniens* in Light of the Forum Selection Clause in the Parties' Contract. .................................... 8

        1.   The Parties Agreed To Litigate Contractual and Noncontractual Disputes In Amsterdam, And They Agreed That Dutch Law Governs. .................................... 8

        2.   The Court Enforces Forum Selection Clauses Through The Doctrine of *Forum Non Conveniens.* .............................................................................................. 9

        3.   The *Forum Non Conveniens* Factors Applied In Choice of Forum Cases Favor Dismissal. ........................................................................................................ 10

    B.   The Court Lacks Personal Jurisdiction. .................................................................. 16

        1.   The Long-Arm Statute Does Not Grant Jurisdiction Here. ........................... 16

        2.   Jurisdiction Is Improper Under The Due Process Clause. ............................. 20

Conclusion ........................................................................................................................ 23

## TABLE OF AUTHORITIES

### Cases

*Abbate v. Abbate,* 82 A.D.2d 368 (2d Dept. 1981) ........................................................ 18

*Aenergy, S.A. v. Republic of Angola,* 2021 U.S. Dist. LEXIS 95336
   (S.D.N.Y. May 19, 2021) .......................................................................................... 15

*Allen v. Inst. For Family Health,* 159 A.D.3d 554 (1st Dept. 2018) ............................. 18

*Asahi Metal Indus. Co. v. Super. Ct. of Cal.,* 480 U.S. 102 (1987) ......................... 21, 22

*Atl. Marine Constr. Co. v. U.S. Dist. Ct. for the W. Dist. of Tex.,* 571 U.S. 49 (2013) ................. 9

*Banca Di Credito Cooperativo di Civitanova Marche e Montecosaro Soc.
   Cooperativa v. Small,* 852 Fed. App'x 15 (2d Cir. 2021) ........................................ 12

*Bank v. Laptop & Desktop Repair, LLC,* 206 F. Supp. 3d 772 (E.D.N.Y. 2016) ......................... 11

*Benefits By Design Corp. v. Contractor Mgmt. Servs., LLC,* 75 A.D.3d 826
   (3d Dept. 2010) ........................................................................................................ 19

*Best Van Lines, Inc. v. Walker,* 490 F.3d 239 (2d Cir. 2007) ....................................... 17

*Charles Schwab Corp. v. Bank of Am. Corp.,* 883 F.3d 68 (2d Cir. 2018) ................... 20

*Chloe v. Queen Bee of Beverly Hills, LLC,* 616 F.3d 158 (2d Cir. 2010) ..................... 21

*D&R Global Selections, S.L. v. Bodega Olegario Falcon Pineiro,* 29 N.Y.3d 292 (2017) ......... 17

*Danser v. Firestone Tire & Rubber Co.,* 86 F.R.D. 120 (S.D.N.Y. 1980) ..................... 10

*Direct Mail Prod. Servs. v. MBNA Corp.,* 2000 U.S. Dist. LEXIS 12945
   (S.D.N.Y. Sept. 6, 2000) .......................................................................................... 13

*Euromepa S.A. v. Esmerian, Inc.,* 154 F.3d 24 (2d Cir. 1998) ..................................... 12

*Evolution Online Sys. Inc. v. Koninklijke PTT Nederland N.V.,* 145 F.3d 505 (2d Cir. 1998) ..... 16

*Fin. Guar. Ins. Co. v. IKB Deutsche Industriebank AG,* 2008 N.Y. Misc. LEXIS 7520
   (Sup. Ct. N.Y. County Dec. 29, 2008) ..................................................................... 13

*First Union Nat'l Bank v. Banque Paribas,* 135 F. Supp. 2d 443 (S.D.N.Y. 2001),
   *aff'd sub nom. First Union Nat'l Bank v. Arab African Int'l Bank,*
   48 Fed. Appx. 801 (2d Cir. 2002) (mem.) ............................................................... 10

*Fischbarg v. Doucet,* 38 A.D.3d 270 (1st Dept.), *aff'd,* 9 N.Y.3d 375 (2007) ...................... 17, 18

*Grand River Enters. Six Nations, Ltd. v. Pryor,* 425 F.3d 158 (2d Cir. 2005) ............................ 16

*Hugel v. Corp. of Lloyd's,* 999 F.2d 206 (7th Cir. 1993) ................................................................ 13

*Kinsey v. New York Times Co.,* 991 F.3d 171 (2d Cir. 2021) ........................................................ 8

*Klotz v. Xerox Corp.,* 519 F. Supp. 2d 430 (S.D.N.Y. 2007) ........................................................ 12

*Licci v. Lebanese Canadian Bank,* 732 F.3d 161 (2d Cir. 2013) ............................................. 16, 20

*Malka v. E.F. Hutton & Co.,* 465 F. Supp. 131 (S.D.N.Y. 1979) , *aff'd,* 636 F.2d 1202
    (2d Cir. 1980) ................................................................................................................................ 10

*Martinez v. Bloomberg LP,* 740 F.3d 211 (2ad Cir. 2014) ...................................................... 11, 15

*Mije Assocs. v. Halliburton Servs.,* 552 F. Supp. 418 (S.D.N.Y. 1982) ...................................... 19

*Osuna v. Citigroup, Inc.,* 2018 U.S. Dist. LEXIS 169589 (S.D.N.Y. Sept. 27, 2018),
    *aff'd,* 820 Fed. App'x 38 (2d Cir. 2020) (mem.) ........................................................................ 15

*Painewebber, Inc. v. Westgate Group, Inc.,* 748 F. Supp. 115 (S.D.N.Y. 1990) ........................ 18

*Potomac Capital Inv. Corp. v. Koninklijke Luchtvaart Maatschappij N.V.,* 1998 U.S. Dist.
    LEXIS 2343 (S.D.N.Y. Mar. 3, 1998) ........................................................................................ 14

*Scarcella v. Am. Online, Inc.,* 11 Misc.3d 19 (App. Term. 1st Dept. 2005) ................................ 15

*Schertenlieb v. Traum,* 589 F.2d 1156 (2d Cir. 1978) .................................................................... 10

*Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.,* 549 U.S. 422 (2007) .................................. 8

*Starkey v. G Adventures, Inc.,* 796 F.3d 193 (2d Cir. 2015) ..................................................... 9, 10

*Sterling Nat'l Bank v. Eastern Shipping Worldwide, Inc.,* 35 A.D.3d 222 (1st Dept. 2006) ....... 10

*SunLight Gen. Capital LLC v. CJS Invs. Inc.,* 114 A.D.3d 521 (1st Dept. 2014) ........................ 17

*United Bank of Kuwait, PLC v. James M. Bridges, Ltd.,* 766 F. Supp. 113 (S.D.N.Y. 1991)...... 19

*Walker, Truesdell, Roth & Assocs., Inc. v. Globeop Fin. Servs. LLC,*
    2013 N.Y. Misc. LEXIS 6561 (Sup. Ct. N.Y. County May 27, 2013) .................................... 12

*Weiss v. Greenberg, Traurig, Askew, Hoffman, Lipoff, Quentel & Wolff, P.A.,*
    85 A.D.2d 861 (3d Dept. 1981) ................................................................................................. 20

*Wilson v. Dantas,* 128 A.D.3d 176 (1st Dept. 2015), *aff'd,* 29 N.Y.3d 1051 (2017) .................. 18

*Woodling v. Garrett Corp.,* 813 F.2d 543 (2d Cir. 1987) ................................................................ 9

Statutes

28 U.S.C. § 1404 ................................................................................................................ 9

28 U.S.C. § 1782(a) ........................................................................................................ 15

C.P.L.R. § 302(a) ............................................................................................................ 16

C.P.L.R. § 302(a)(1) ....................................................................................................... 17

C.P.L.R. § 302(a)(3) ................................................................................................. 19, 20

Rules

Fed. R. Civ. P. 44.1 ........................................................................................................ 12

Other Authorities

*Restatement (Second) of Conflict of Laws* § 187 (1988) ................................................ 9

Tom McNamara, *International Forum Selection and Forum Non Conveniens,*
    34 Int'l Law. 558 (2000) ........................................................................................... 16

World Justice Project, *Rule of Law Index 2021, available at*
    https://worldjusticeproject.org/sites/default/files/documents/WJP-INDEX-21.pdf ................. 16

PRELIMINARY STATEMENT

Stuart Pivar, an art collector, sought out the opinion of the Van Gogh Museum Foundation,[1] located in Amsterdam, on the authenticity of a painting he acquired in early 2021 and believed to be a work of Vincent Van Gogh. The Museum, per its usual practice, was willing to provide its opinion without charge, but only if Mr. Pivar agreed to its standard terms and conditions for authentication requests, which provide that all disputes arising out of or relating to the work would be submitted solely to the courts in Amsterdam. Mr. Pivar agreed, and the Museum gave him, privately, the opinion he had asked for. It opined that the painting is not a Van Gogh. Mr. Pivar, who publicized his supposed find before asking the Museum's opinion and who then publicized the Museum's opinion, has asserted that the Museum got it wrong and is therefore liable to him for $300 million.

The forum selection clause is plainly enforceable and requires the Court to dismiss this action under the doctrine of *forum non conveniens.* Moreover, the Museum and its authentication work lack sufficient connections with New York to allow this Court to exercise jurisdiction under both the New York long-arm statute and the Due Process Clause. For all these reasons, the Court should dismiss the action.

FACTS

A.    The Van Gogh Museum.

The Van Gogh Museum is home to the world's largest collection of Van Gogh's works, including more than 200 paintings, 500 drawings, and more than 800 letters. Formerly a state museum (in addition to its main collection, it still houses and displays a state-owned collection

---

[1] The Van Gogh Museum Foundation, in Dutch, *Stichting Van Gogh Museum voorheen Rijksmuseum Vincent van Gogh / Rijksmuseum H.W. Mesdag,* uses the trade name "Van Gogh Museum," and in this memorandum, it is referred to as "the Museum."

and is still state-subsidized), since the 1990s, it has been operated by the Van Gogh Museum

Foundation, the defendant in this action. (Vellekoop Decl. ¶¶ 2-3).

The Museum is deeply engaged in authenticity research. It receives hundreds of

applications each year seeking its opinion of the authenticity of works attributed to Van Gogh.

The Museum provides its opinion to art owners free of charge.[2] In most cases, the Museum's

researchers are able to give an opinion based only on photographs of the work. Only occasionally

does the Museum invite owners to send the work itself to the Museum for more detailed

examination. When the Museum's researchers are of the opinion that the artwork is not by Van

Gogh, the Museum usually does not provide a detailed substantiation of its researchers' findings

(though it did provide a detailed substantiation in Mr. Pivar's case). The practice of rejecting

artworks based solely on photographs and documentation is not uncommon in the field of art

history, and the Museum endorses it as an accepted practice. While works are occasionally

authenticated (the Museum authenticated *Self Portrait (1889),* for example, in 2020),

authentication of an unknown work of art as a Van Gogh is an exceptional and rare occurrence.

(Vellekoop Decl. ¶¶ 4-7).

B.    Stuart Pivar and *Auvers, 1890.*

Mr. Pivar is a New York art collector. He alleges that he acquired a painting titled

*Auvers,* 1890, in March 2021. He alleges that he "had every reason to believe [it] was an

authentic work of art created by Vincent Van Gogh." (Compl. ¶ 3).

The Museum first learned of Mr. Pivar's acquisition in April 2021, when the director

emerita of a museum in Nassau County told the Museum that an unnamed collector had loaned

---

[2] In some cases, where technical research is needed that the Museum cannot perform itself in order to reach an opinion, the Museum may charge for additional research costs or expenses. But that did not happen here. (Vellekoop Decl. ¶ 5).

her museum the painting, that there were plans to exhibit it, and that the collector had asked her to send photographs of the painting to the Museum for its comments. (Vellekoop Decl. ¶ 8 and Ex. 1). Mr. Pivar himself followed up with an unsolicited email indicating that he was the owner of the painting asking for the Museum's advice. (Id. ¶ 9 & Ex. 2).

A few days later, the Museum, which was closed due to the COVID-19 pandemic, responded. It informed Mr. Pivar that he could submit an application for authentication, but that the Museum would be unable to consider the application until it reopened. (Id. ¶ 10 & Ex. 3).[3] Mr. Pivar responded that he was not seeking the Museum's opinion regarding authenticity; he and his team had already investigated and published their findings. (Id. ¶ 11 & Ex. 4). But he quickly changed his mind. A few days later, the Museum received an email from Howard Shaw, a New York art dealer, who wrote that he was "reluctantly" writing on behalf of "an old friend who is trying to assist the owner of" the painting. (Id. ¶ 12 & Ex. 5). Teio Meedendorp, a Museum researcher, told Mr. Shaw that the Museum had already corresponded with Mr. Pivar, but that rather than seeking the Museum's opinion by submitting an authentication request, Mr. Pivar had simply gone public with his claims. Nevertheless, Mr. Meedendorp advised Mr. Shaw that he could suggest to his friend that Mr. Pivar submit an application for the Museum's opinion on authenticity. (Id. ¶ 13 & Ex. 6). Mr. Shaw wrote that he would pass along the information. Presciently, he wrote that the Museum's requirement of requiring a formal application from the owner subject to its terms and conditions before opining on authenticity was "very wise" given "the litigiousness of disappointed owners." (Id. ¶ 14 & Ex. 7). Perhaps this was a subtle reference to Mr. Pivar's 2019 lawsuit against Sotheby's, in which he alleged that Sotheby's was liable to

---

[3] In fact, the Museum modified its website in mid-2020 to remove the ability for members of the public to submit authentication requests via the web. The Museum restored the web functionality in September 2021. (Vellekoop Decl. ¶ 10).

him for $750 million after it refused to accept consignment of a work purportedly by Georgia O'Keeffe after concluding that it was not authentic; the court dismissed the case from the bench without leave to amend in December 2020. (Folkman Decl. ¶¶ 2-3 & Ex. 1-2).

Mr. Pivar ignored or misunderstood the Museum's message. Rather than submitting an application, as Mr. Meedendorp had advised, Mr. Pivar, via his assistant, sent another unsolicited email: "Thank you for the opportunity to present *Auvers, 1890* for your viewing. We shall organize immediately to ship the painting at our expense." (Vellekoop Decl. ¶ 15 & Ex. 8). When he did not hear back immediately, he sent a second unsolicited message: "We had made the presumption that you wish to inspect *Auvers, 1890.* Please tell us if indeed you wish the painting to be shipped." (Id. ¶ 16 & Ex. 9). The Museum responded. Although it reiterated that it was not processing authentication requests during the pandemic, it wrote that it would make an exception in Mr. Pivar's case if he would sign and return a written agreement to be bound by the Museum's terms and conditions. But it made it clear that Mr. Pivar should not send the painting to the Museum without an invitation to do so. The Museum's email included, as attachments, the blank agreement, the General Terms and Conditions of the Van Gogh Museum Foundation for purposes of Researching Authenticity, and the Museum's privacy policy. (Id. ¶ 17 & Ex. 10).

The agreement, titled "AUTHENTICATION REQUEST," had blanks for the owner of the work to provide his contact information and basic information concerning the work, including its provenance and the date of acquisition. It also provided that the request was "subject to our General Terms and Conditions of the Van Gogh Museum Foundation for purposes of Researching Authenticity (hereinafter referred to as *General Terms and Conditions Researching Authenticity*)," and it stated: "By signing this document, you acknowledge that you

are familiar with and consent to the *General Terms and Conditions Researching Authenticity ...*"). (Id.).

The General Terms and Conditions, which underlie Mr. Pivar's claim for breach of contract and which are attached as an exhibit to his Complaint, include the following provisions on choice of law and choice of forum:

> 11.1.    These Terms and Conditions and all obligations arising therefrom or extra-contractual obligations related thereto are governed by Dutch law, with the exception of the Dutch private international law rules on the conflict of laws.

> 11.2.    To the extent that national or international rules of law do not mandatorily provide otherwise, any disputes in the matter of or arising from or related to these Terms and Conditions or the contractual and extra-contractual obligations arising therefrom or related thereto will solely be submitted for settlement to the competent court in Amsterdam.

(Vellekoop Decl. Ex. 10; *see also* Compl. Ex. B).

The same day, Mr. Pivar's assistant returned the signed form, with Mr. Pivar's signature and dated May 14, 2021, to the Museum via email. (Vellekoop Decl. ¶ 18 Ex. 11).[4]  Mr. Pivar also sent digital images of the work as well as additional information concerning its provenance, some of which he later acknowledged was incorrect. (Vellekoop Decl. ¶ 19 & Ex. 12-15).

Two months later, the Museum sent Mr. Pivar its report concerning the authenticity of the work. (Id ¶ 20 & Ex. 16). The report was in the form of a letter that begins by referencing the General Terms and Conditions and states the Museum's opinion that "the painting *Auvers* cannot be attributed to Vincent van Gogh," and an accompanying document titled "Art Historical Report" explaining the Museum's opinion in detail. The purpose of this motion is to avoid

---

[4] The version of the signed form attached to the Complaint is dated June 1, not May 14. After a review of its files, the Museum is confident that it never received the June 1 version of the Request. (Vellekoop Decl. ¶ 18). The two versions of the Request differ in minor ways, most notably in the title of the work ("*Auvers,*" versus "*Auvers, 1890*"), the date of acquisition given ("2021," versus "3/1/2021"), and the provenance information (a blank, versus "Collection Jonas Netter"). But both versions contain identical language regarding the General Terms and Conditions.

litigation of the merits in New York in favor of litigation in the parties' chosen forum, the

Netherlands, so we do not lay out the details of Mr. Pivar's evolving positions regarding the

provenance of the work or the reasons for the Museum's conclusions. Suffice it to say that the

Museum stands by its report, which represents the opinion of its expert researchers and which the

Museum believes is correct.

Mr. Pivar promptly sent a letter demanding that the Museum "withdraw[]" its report (in

fact, the report had not been made public or shared with anyone except Mr. Pivar) and threatened

"legal proceedings" that could be "calamitous" if the Museum did not "take in the Painting for a

legitimate study":

> My attorneys are drafting a Complaint to be filed in New York State US Supreme Court
> v. the Van Gogh Museum and the Government of the Netherlands demanding one billion
> dollars in damages for declaring falsely that the newly-discovered painting Auvers, 1890,
> signed by Vincent Van Gogh is a fake.

(Vellekoop Decl. ¶ 21 & Ex. 17).[5] This lawsuit followed (though between the date of his emailed

threat and the date of the Complaint, Mr. Pivar reduced his $1 billion damage demand by two-

thirds and dropped the threatened claims against the Dutch government. The billion-dollar figure

apparently rested on the "humiliation" Mr. Pivar claims he suffered and the "doubt" cast on the

"integrity of his valuable art collection"). (Id.).

Mr. Pivar brings two closely related claims. First, he claims that the Museum was

negligent because it failed to "use its best efforts and employ all due diligence," in evaluating his

painting, alleging that the report was "cursory, dismissive and perfunctory" and that the report's

"general tone" showed that the Museum "had determined that the Painting was not authentic

---

[5] The email falsely stated that "the previous director [had] asked for the Painting to be shipped to the museum for study." In fact, Emilie Gordenker became director of the Museum in early 2020, long before Mr. Pivar acquired the painting, and she remains the director today. The Museum consistently told Mr. Pivar not to send the painting. (Vellekoop Decl. ¶ 15).

prior to examining the submissions provided by Plaintiff." (Compl. ¶¶ 13-15). Second, he claims that the Museum breached Paragraph 3.1 of the General Terms and Conditions—the same document that contains the choice of law and choice of forum agreements—which required the Museum to use "the due care expected of a good contracting party." (Compl. ¶¶ 21-22). Both claims assert that the Museum failed to act with due care in carrying out its authentication work. Mr. Pivar claims that he has been damaged in an amount exceeding $300 million, since if the painting is not authentic, then it is not a "once-in-a-lifetime find," as he told *Page Six, see* Emily Smith, *Long-Lost Van Gogh Masterpiece 'Discovered' By NYC Collector,* Page Six, *available at* https://pagesix.com/2021/05/20/stuart-pivar-claims-hes-rediscovered-a-long-lost-van-gogh/ (May 20, 2021), or the "greatest art find in 100 years," the "find of the century," as he told *The Hill,* see Jenna Romaine, *In Greatest Art Find in 100 Years, Man Discovers Long-Lost Van Gogh Masterpiece,* The Hill, *available at* https://thehill.com/changing-america/enrichment/arts-culture/554711-in-greatest-art-find-in-100-years-man-discovers-long (May 20, 2021), but instead just a painting with "only a nominal or decorative value" (Compl. ¶10).

ARGUMENT

A.    The Court Should Dismiss The Case Under The Doctrine of *Forum Non Conveniens* in Light of the Forum Selection Clause in the Parties' Contract.[6]

    1.    The Parties Agreed To Litigate Contractual and Noncontractual Disputes In Amsterdam, And They Agreed That Dutch Law Governs.

There is no question that the forum selection clause in the General Terms and Conditions formed part of the parties' contract. Pivar alleges (Compl. ¶ 4) that he submitted the request for authentication to the Museum and provided images of the painting to the Museum "as per the Authentication Form and the Terms and Conditions referenced therein." He attached the General Terms and Conditions to his complaint as an exhibit. (Compl. ¶ 4 & Ex. B). He brings a claim for breach of contract which alleges that the Museum breached its obligation under ¶ 3.1 of the General Terms and Conditions to use "the due care expected of a good contracting party." (Compl. ¶¶ 31-32). In short, the complaint itself makes it perfectly clear that the General Terms and Conditions, which contain the forum selection clause, form part of the parties' contract.

The parties' contract contains not just an agreement on the forum, but an agreement on the governing law: the parties chose Dutch law to govern both the contract and "extra-contractual obligations related thereto." The Court must apply New York conflict of laws principles to decide which law governs. *See Kinsey v. New York Times Co.,* 991 F.3d 171, 176 (2d Cir. 2021).

---

[6] Although the Museum has also raised a personal jurisdiction argument, this memorandum addresses *forum non conveniens* first, and the Museum submits that the Court should decide *forum non conveniens* first. District courts have "discretion to respond at once to a defendant's *forum non conveniens* plea, and need not take up first any other threshold objection," including "personal jurisdiction over the defendant if it determines that, in any event, a foreign tribunal is plainly the more suitable arbiter of the merits of the case." *Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.,* 549 U.S. 422, 425 (2007). It is appropriate to decide *forum non conveniens* before personal jurisdiction where "considerations of convenience, fairness, and judicial economy so warrant." *Id.* at 432. Given the strength and factual simplicity of the *forum non conveniens* argument, which is based on a forum selection clause that was fully disclosed to Mr. Pivar and that Mr. Pivar accepted when he signed the contract, and the necessity to weigh the Museum's contacts with New York before deciding whether the Museum transacted business here or tortiously caused an injury here in order to decide whether the Court has personal jurisdiction, it is simpler to decide the *forum non conveniens* issue first, even though, as shown below, the only possible conclusion, after weighing the Museum's contacts with New York, is that the Court lacks personal jurisdiction.

When, as here, the parties have chosen a law to govern and the chosen law has a "substantial relationship to the parties or their performance, New York law requires the court to honor the parties' choice insofar as matters of substance are concerned, so long as fundamental policies of New York law are not thereby violated." *Woodling v. Garrett Corp.,* 813 F.2d 543, 551 (2d Cir. 1987) (citation omitted). Of course, Dutch law has a substantial relationship to the parties and their performance, since the Museum is incorporated in the Netherlands and has its only place of business there, and since it performed its obligations under the contract in the Netherlands. *See Restatement (Second) of Conflict of Laws* § 187, cmt. f (1988). No fundamental policy could support the view that a Dutch museum that provides authentication services free of charge to art owners even when they are not from the Netherlands cannot condition its willingness to provide those services on the art owners' agreement that the parties' arrangement will be governed by Dutch law. Thus, Dutch law governs.

      2.      <u>The Court Enforces Forum Selection Clauses Through The Doctrine of *Forum Non Conveniens.*</u>

"[T]he appropriate way to enforce a forum-selection clause pointing to a state or foreign forum is through the doctrine of *forum non conveniens.*" *Atl. Marine Constr. Co. v. U.S. Dist. Ct. for the W. Dist. of Tex.,* 571 U.S. 49, 60 (2013). Although *Atlantic Marine* arose under 28 U.S.C. § 1404, the statute that "codif[ies] the doctrine of *forum non conveniens* for the subset of cases in which the transferee forum is within the federal court system," *id.* at 60, its rule applies in cases where the defendant seeks dismissal rather than transfer (because the Court cannot transfer a case to a court in a foreign country). *See id.* at 60-61 ("[T]he residual doctrine of *forum non conveniens* has continuing application in federal courts") (citation and internal quotation marks omitted); *Starkey v. G Adventures, Inc.,* 796 F.3d 193, 196 (2d Cir. 2015) (applying *forum non*

*conveniens* doctrine to decide motion to enforce a forum selection clause calling for litigation in

a foreign country).

> 3.   The *Forum Non Conveniens* Factors Applied In Choice of Forum Cases Favor
>       Dismissal.

The Court should apply a three-part analysis when deciding whether a forum selection

clause is presumptively enforceable:[7] (1) whether the forum selection clause was reasonably

communicated to the party resisting enforcement; (2) whether the clause is mandatory or

permissive; and (3) whether the claims and the parties involved in the action are subject to the

forum selection clause. *Starkey,* 796 F.3d at 196 (citation and internal quotation marks omitted).

If the clause *is* presumptively enforceable, then the Court should consider a fourth factor: (4)

whether the party resisting enforcement makes a sufficiently strong showing that enforcement

would be unreasonable or unjust.[8] *Id.* Because the parties chose Dutch law to govern, the Court

should apply Dutch law to the second and third factors, which involve the *interpretation* of the

---

[7] It is an open question whether, in a diversity case, federal common law or state law governs *forum non conveniens.* *See Gulf Oil Corp. v. Gilbert,* 330 U.S. 501, 509 (1947). In *Schertenlieb v. Traum,* 589 F.2d 1156 (2d Cir. 1978), the court applied federal common law; it noted that while the question was open, federal and state law were so similar that nothing turned on the question. *Schertenlieb,* 589 F.2d at 1162 n.13; *see also Piper Aircraft Co. v. Reyno,* 454 U.S. 235, 248 n.13 (1981) (declining to decide the question because federal and state law were virtually identical). This memorandum follows *Schertenlieb* in arguing from federal common law on the grounds that there is no material difference between federal and New York law in this case. *See Danser v. Firestone Tire & Rubber Co.,* 86 F.R.D. 120, 121 n.1 (S.D.N.Y. 1980) (following *Schertenleib*); *Malka v. E.F. Hutton & Co.,* 465 F. Supp. 131, 137 n.1 (S.D.N.Y. 1979), *aff'd,* 636 F.2d 1202 (2d Cir. 1980) (mem.) (same). *See also First Union Nat'l Bank v. Banque Paribas,* 135 F. Supp. 2d 443, 447 n.13 (S.D.N.Y. 2001), *aff'd sub nom. First Union Nat'l Bank v. Arab African Int'l Bank,* 48 Fed. Appx. 801 (2d Cir. 2002) (mem.) ("the New York law of *forum non conveniens* is virtually identical to the federal law"). We cite New York cases on several points to show that the two laws do not differ in the relevant respects.

[8] The analysis under New York law is similar. New York has a "well-settled policy … to enforce contractual provisions for … selection of a forum for litigation." *Sterling Nat'l Bank v. Eastern Shipping Worldwide, Inc.,* 35 A.D.3d 222, 222 (1st Dept. 2006). Such clauses are prima facie valid and are enforced "because they provide certainty and predictability in the resolution of disputes." *Id.* (citations omitted). In New York law, a valid forum selection clause will be enforced unless the party resisting enforcement shows that enforcement would be "unreasonable and unjust." *Sterling,* 35 A.D.3d at 222. New York law also provides an exception to enforcement if the party resisting enforcement shows that the clause is invalid because of "fraud or overreaching," or that a trial in the agreed forum "would be so gravely difficult and inconvenient that the challenging party would, for all practical purposes, be deprived of his or her day in court." *Id.* (citation omitted).

choice of forum clause; federal law governs the first and fourth factors, which involve the *enforceability* of the choice of forum clause. *See Martinez v. Bloomberg LP,* 740 F.3d 211, 217-18 (2d Cir. 2014).

a.    <u>The Clause is Presumptively Enforceable.</u>

*First,* the forum selection clause was reasonably communicated to Mr. Pivar. This conclusion follows from the Complaint itself, which makes it perfectly plain that Mr. Pivar understood the General Terms and Conditions formed part of his contract with the Museum. His claim for breach of contract is a claim that the Museum breached an obligation found only in the General Terms and Conditions. Mr. Pivar can hardly claim that the Museum is liable because it breached the General Terms and Conditions but that he did not know about them or that they did not form part of the parties' contract. *See Bank v. Laptop & Desktop Repair, LLC,* 206 F. Supp. 3d 772, 777-78 (E.D.N.Y. 2016) (plaintiff's pleading acknowledged that general terms and conditions constituted the contract between the parties). But in any event, the Museum reasonably communicated the General Terms and Conditions to Mr. Pivar by emailing a copy to him. This is not a case where a party received notice that another document was incorporated but did not receive the other document.

*Second,* the clause is mandatory (van der Plas Decl. ¶ 9). It provides that disputes "in the matter of or arising from or related to these Terms and Conditions or the contractual and extra-contractual obligations arising therefrom or related thereto will *solely* be submitted for settlement to the competent court in Amsterdam" (emphasis supplied). Under Dutch law, to determine whether a choice of forum clause is exclusive, the Court must interpret the relevant clause. (van

der Plas Decl. ¶ 5).[9] The interpretation of the clause depends on its wording, the meaning that the parties could reasonably ascribe to the wording, and the parties' reasonable expectations of each other. (Id.). This is the same standard applicable to the interpretation of other kinds of contractual provisions. (Id.). The wording itself is an important factor where, as here, there were no negotiations or discussions regarding the contract between the parties. (Id.). If a choice of forum expressly states that it is exclusive, then it *is* exclusive. (van der Plas Decl. ¶ 7). Indeed, a choice of forum clause can be mandatory under Dutch law even if it does not expressly use a word such as "exclusive" or "sole" that imports exclusivity. (Id. ¶ 6).[10] The choice of Dutch law to govern and the fact that the Museum is a non-profit organization providing its authentication services without charge make it even more certain that the choice of forum clause should be treated as exclusive. (van der Plas Decl. ¶ 8).

*Third,* both parties, and both of Mr. Pivar's claims, are subject to the forum selection clause. Both Mr. Pivar and the Museum are bound by the General Terms and Conditions. The clause extends to all claims "in the matter of or arising from or related to these Terms and Conditions or the contractual and extra-contractual obligations arising therefrom or related

---

[9] Issues of foreign law raise questions of law, not fact, and the Court may consider "any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence." Fed. R. Civ. P. 44.1. We submit a declaration of Cathalijne van der Plas, a Dutch lawyer and academic expert in private international law, on the issues of Dutch law raised by this motion, and it is proper for the Court to consider the declaration when considering the Dutch law issues. *See Euromepa S.A. v. Esmerian, Inc.,* 154 F.3d 24, 28 n.2 (2d Cir. 1998).

[10] The outcome would be the same under US law. The word "sole," or "solely," signifies exclusivity in both federal and New York law. *See Banca Di Credito Cooperativo di Civitanova Marche e Montecosaro Soc. Cooperativa v. Small,* 852 Fed. App'x 15, 20 (2d Cir. 2021) ("The forum selection clauses in the Agreements, by utilizing the terminology of exclusivity in addressing jurisdiction (e.g., 'shall,' 'sole,' and 'solely'), are clearly mandatory"); *Klotz v. Xerox Corp.,* 519 F. Supp. 2d 430, 434 (S.D.N.Y. 2007) (equating "solely," in a forum selection clause, with "only"); *Walker, Truesdell, Roth & Assocs., Inc. v. Globeop Fin. Servs. LLC,* 2013 N.Y. Misc. LEXIS 6561, at *13-14 (Sup. Ct. N.Y. County May 27, 2013) ("New York Courts distinguish between mandatory forum selection clauses, which provide that the specified forum is the exclusive *or sole* forum in which the matter may be heard, and permissive clauses …") (emphasis supplied).

thereto." In this context, too, Dutch law requires interpretation of the forum selection clause, which depends on its wording, the meaning that the parties could reasonably ascribe to the wording, and the parties' reasonable expectations. (van der Plas Decl. ¶ 6). Given the clear and broad wording of the clause concerning its scope, especially in light of the circumstances of the case (the Museum required adoption of its terms and conditions, including the forum selection clause before giving its opinion, at no cost to Mr. Pivar, on authenticity, and the extra-contractual claim is based on the same facts as the contractual claim), the only plausible reading of the clause is that it reaches both the contractual and the extra-contractual claims Mr. Pivar asserts. (Id. ¶¶ 10-12).[11]

        b.     <u>Mr. Pivar Cannot Overcome the Presumption.</u>

Because the forum selection clause is presumptively enforceable considering the factors discussed above, the Court must consider whether Mr. Pivar could show that enforcement of the clause would be unreasonable or unjust. To succeed, Mr. Pivar would have to show that the incorporation of the clause in the contract was the result of "fraud or overreaching," that the law to be applied in the Netherlands would be "fundamentally unfair," that enforcement would contravene a "strong public policy" of the forum state, or that a trial in the Netherlands would be

---

[11] Again, the outcome would be the same under US law. The claim for breach of paragraph 3.1 of the General Terms and Conditions is self-evidently a claim that arises from the General Terms and Conditions. The negligence claim plainly involves an "extra-contractual obligation[] arising [from the contract] or related thereto," and thus, the parties intended that the forum selection clause would apply to it. In any case, the negligence claim is just a restatement of the contract claim: in both claims, Mr. Pivar asserts that the Museum failed to use due care in performing the authentication work. Because the Museum's duty to Mr. Pivar, if it had one, arose out of the contract between them, and because the two claims rest on a single set of alleged facts, Mr. Pivar cannot escape the scope of the forum selection clause by pleading a non-contractual claim in the alternative. *See Hugel v. Corp. of Lloyd's,* 999 F.2d 206, 209 (7th Cir. 1993). *See also Direct Mail Prod. Servs. v. MBNA Corp.,* 2000 U.S. Dist. LEXIS 12945, at *17 (S.D.N.Y. Sept. 6, 2000) (citation omitted) ("contract-related tort claims involving the same operative facts as a parallel claim for breach of contract should be heard in the forum selected by the contracting parties"). The same rule applies in New York law. *See Fin. Guar. Ins. Co. v. IKB Deutsche Industriebank AG,* 2008 N.Y. Misc. LEXIS 7520, at *17 (Sup. Ct. N.Y. County Dec. 29, 2008).

so difficult that Mr. Pivar would be effectively deprived of his day in court. *Phillips,* 494 F.3d at 392. He could make no such showing.

    *First,* of course there was no fraud here. The Museum did not trick Mr. Pivar or pull the wool over his eyes. It sent him a copy of the General Terms and Conditions before he signed the contract. He knew what he was signing, and indeed, he made the General Terms and Conditions the basis of his claim for breach of contract.

    *Second,* the law that the Dutch courts would apply to the case is the same as the law that this Court would apply if the case were litigated here, namely, Dutch law, because the parties chose Dutch law to govern their relationship. As shown above, under New York conflict of laws rules, the Court should give effect to their choice of law. Thus this is not a case where the party resisting dismissal on *forum non conveniens* grounds can show that the foreign court would apply a law less favorable to him than the law the US court would apply, let alone a law that would be fundamentally unfair to him. Dutch law governs no matter the forum, because of the parties' choice of law agreement. Indeed, while this Court can apply Dutch law if necessary, a Dutch court is better positioned to apply the law that the parties agreed should govern. *See Potomac Capital Inv. Corp. v. Koninklijke Luchtvaart Maatschappij N.V.,* 1998 U.S. Dist. LEXIS 2343, at *46-47 (S.D.N.Y. Mar. 3, 1998) (choice of Dutch law favored Netherlands as the proper forum in a forum non conveniens motion, in order to avoid unnecessary problems in the application of foreign law).

    *Third,* no public policy weighs against enforcement of the parties' agreement. While we reserve the right to reply to any public policy argument Mr. Pivar should make, no relevant public policies are readily apparent. Only a "strong countervailing" public policy will suffice before a court will decide not to "give effect to the legitimate expectations of the parties,

14

manifested in their freely negotiated agreement." *Martinez,* 740 F.3d at 220 (citation and internal quotation marks omitted).

 *Fourth,* nothing about a trial in the Netherlands would be so difficult as to deprive Mr. Pivar of his day in court. In small-dollar cases, courts sometimes refuse to enforce a choice of forum where litigation abroad would be prohibitively expensive for the plaintiff. *See, e.g., Scarcella v. Am. Online, Inc.,* 11 Misc.3d 19 (App. Term. 1st Dept. 2005) (requiring litigation of a $5,000 consumer claim in another US state would be prohibitively expensive; enforcement denied). But a wealthy, sophisticated art collector who brings a $300 million lawsuit cannot be heard to complain that it would be too expensive to litigate the claim in the Netherlands. Nor is there any question in this case about the unavailability of witnesses or evidence. Apart from Mr. Pivar himself, all the likely fact witnesses are in the Netherlands, since Mr. Pivar's claims focus on the Museum's alleged failure to perform its duties. In any event, the United States gives parties to foreign litigation a ready means to obtain evidence in the United States for use in civil actions abroad. *See* 28 U.S.C. § 1782(a); *see also Aenergy, S.A. v. Republic of Angola,* 2021 U.S. Dist. LEXIS 95336, at *29-30 (S.D.N.Y. May 19, 2021) (noting availability of § 1782 in *forum non conveniens* analysis); *Osuna v. Citigroup, Inc.,* 2018 U.S. Dist. LEXIS 169589, at *31-32 (S.D.N.Y. Sept. 27, 2018), *aff'd,* 820 Fed. App'x 38 (2d Cir. 2020) (mem.) (same). The Dutch courts also make it possible for litigants or witnesses to appear remotely (online or via telephone) in appropriate cases, and they accept evidence in English, usually without requiring a translation. (van der Plas Decl. ¶ 13).

 The Dutch legal system is widely regarded as among the best in the world. The World Justice Project's *Rule of Law Index 2021* lists the Netherlands as sixth in the world on its rule of law index, and fourth in the world in its civil justice index. *See generally* World Justice Project,

*Rule of Law Index 2021,* at 10, 34, *available at*

https://worldjusticeproject.org/sites/default/files/documents/WJP-INDEX-21.pdf.  US courts

regularly dismiss lawsuits on *forum non conveniens* grounds in favor of litigation in the

Netherlands even in the absence of a choice of forum clause. *See, e.g.,* Tom McNamara,

*International Forum Selection and Forum Non Conveniens,* 34 Int'l Law. 558, 560-61 (2000)

(Netherlands is one of the foreign states that US courts have held to be adequate foreign forums).

      In short, Mr. Pivar cannot show that the Dutch forum is inadequate. That is not

surprising, given that he agreed to litigate disputes in the Netherlands. *See Evolution Online Sys.*

*Inc. v. Koninklijke PTT Nederland N.V.,* 145 F.3d 505, 511 (2d Cir. 1998) (choice of forum

agreement is relevant to argument about the adequacy of the chosen forum).

      B.  <u>The Court Lacks Personal Jurisdiction.</u>

      It is Mr. Pivar's burden to show prima facie that the Court has personal jurisdiction,

construing the pleadings and any supporting materials in the light most favorable to him. *See*

*Licci v. Lebanese Canadian Bank,* 732 F.3d 161, 167 (2d Cir. 2013). He must show, first, that

New York law confers jurisdiction, and second, that exercising jurisdiction would comport with

the Due Process Clause. *See Grand River Enters. Six Nations, Ltd. v. Pryor,* 425 F.3d 158, 165

(2d Cir. 2005).

      1.  <u>The Long-Arm Statute Does Not Grant Jurisdiction Here.</u>

      The only two grounds for jurisdiction under the New York long-arm statute that could

possibly exist here are transaction of business within the state; or commission of a tortious act

without the state that causes injury within the state. *See* C.P.L.R. § 302(a). Neither ground

applies.

a.    <u>The Museum Did Not Transact Business In New York.</u>

A court may exercise jurisdiction over a non-domiciliary who transacts any business within New York. C.P.L.R. § 302(a)(1). "Transacting business" in New York means "purposeful activity—some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Best Van Lines, Inc. v. Walker,* 490 F.3d 239, 247 (2d Cir. 2007) (citation and internal quotation marks omitted). When, as here, the defendant has not "set foot in New York," courts will not find the exercise of jurisdiction proper under § 302(a)(1) unless the defendant "actively projected itself into New York." *Fischbarg v. Doucet,* 38 A.D.3d 270, 279 (1st Dept.), *aff'd,* 9 N.Y.3d 375 (2007). And if the defendant has transacted business in New York, the plaintiff must show that his claims arise from the business transacted. *D&R Global Selections, S.L. v. Bodega Olegario Falcon Pineiro,* 29 N.Y.3d 292, 297 (2017).

The Museum undertook no activities in New York or elsewhere that could support jurisdiction under § 302(a)(1). The Museum's only relevant activities were responding by email to Mr. Pivar's unsolicited emails, providing him with an agreement to sign (incorporating the General Terms & Conditions that provided that Dutch law would govern and that disputes would be litigated in the Netherlands), performing its authentication work, free of charge, in the Netherlands, and sending its completed report to Mr. Pivar in New York. None of these are sufficient.

The emails that preceded the formation of the contract cannot constitute the transaction of business in New York, since those emails are not the basis for Mr. Pivar's claims (that is, the claim is not a claim of fraud in the inducement or some other claim that depends on the pre-contract emails). *See SunLight Gen. Capital LLC v. CJS Invs. Inc.,* 114 A.D.3d 521, 522 (1st Dept. 2014).

17

Nor was Mr. Pivar's execution of the standard-form contract document that the Museum sent to him, which was not negotiated within or outside New York, the transaction of business in New York. Even if the Museum had come to New York to execute the contract, that fact alone would not support jurisdiction under the "transacting business" prong of the statute. *See Abbate v. Abbate,* 82 A.D.2d 368, 384 (2d Dept. 1981) (where parties "merely execute the formal document memorializing their agreement in New York, it is doubtful that jurisdiction would be sustained"). But the Museum did not come to New York to sign the contract or for any other purpose; it simply invited Mr. Pivar to execute its standard terms and conditions, which were not subject to negotiation, and to send them to the Museum in the Netherlands so that the Museum could undertake the authentication work. *See Fischbarg,* 38 A.D.3d at 279 ("It is well established that negotiation and execution of contracts by mail and telephone with persons residing in New York is not generally a sufficient basis for personal jurisdiction over non-domiciliaries"). *Contrast Wilson v. Dantas,* 128 A.D.3d 176, 182-83 (1st Dept. 2015), *aff'd,* 29 N.Y.3d 1051 (2017)  (contract negotiated and executed in New York).

Finally, the transmission of the report to New York is insufficient. The Museum did not "project[] itself into business transactions in New York by telephone or mail" or email. *See Painewebber, Inc. v. Westgate Group, Inc.,* 748 F. Supp. 115, 119 (S.D.N.Y. 1990) ("frequent telephone calls and telecopies" to New York and "one meeting" in New York insufficient to meet "transacting business" requirement). Nothing about sending Mr. Pivar the report was "designed to permit [the Museum] to conduct activity in New York." *Id.; contrast Allen v. Inst. For Family Health,* 159 A.D.3d 554 (1st Dept. 2018) (patient sued New Jersey radiologist for malpractice; doctor was licensed to practice medicine in New York and had transmitted his allegedly incorrect findings to a New York medical practice with which he had a contract to

provide radiology services to New York patients). Indeed, it was only the happenstance of Mr.

Pivar's New York residence that led the Museum to transmit the report to him there. The

Museum never sought to avail itself of the privilege of doing business in New York or the

protection of New York law.

       b.    <u>The Museum Caused No Injury To Person Or Property Within New York.</u>

In certain circumstances court can exercise personal jurisdiction where a defendant

commits a tort outside New York that causes "injury to person or property within the state."

C.P.L.R. § 302(a)(3). This prong of the long-arm statute cannot apply here, because there is no

allegation that the Museum caused any personal injury or that it caused any injury to the only

item of property relevant to the case, the painting. Instead, the claim is that because of the

Museum's negligence, Mr. Pivar suffered a financial loss (because the painting, he claims, is

now worth much less than it would have been had the Museum opined that it was authentic).

"The occurrence of financial consequences in New York due to the fortuitous location of

plaintiffs in New York is not a sufficient basis for jurisdiction under § 302(a)(3) where the

underlying events took place outside New York." *United Bank of Kuwait, PLC v. James M.*

*Bridges, Ltd.,* 766 F. Supp. 113, 116 (S.D.N.Y. 1991). Rather the courts regard the situs of the

injury as the place "where the critical events associated with the dispute took place." *Id.* If the

only connection between the tort and New York is the plaintiff's domicile here, jurisdiction is

improper under § 302(a)(3).

The courts regularly apply this principle in cases where the defendant acts negligently

outside of New York in a way that diminishes the New York plaintiff's wealth. *See, e.g., Benefits*

*By Design Corp. v. Contractor Mgmt. Servs., LLC,* 75 A.D.3d 826, 830 (3d Dept. 2010) (escrow

failed to inspect documents properly before releasing escrow funds, causing financial harm in

New York); *Mije Assocs. v. Halliburton Servs.,* 552 F. Supp. 418, 419-20 (S.D.N.Y. 1982)

(geologist outside of New York negligently failed to use the degree of care required in supervising the drilling of wells; injury alleged was financial loss due to decreased well output); *Weiss v. Greenberg, Traurig, Askew, Hoffman, Lipoff, Quentel & Wolff, P.A.,* 85 A.D.2d 861, 862 (3d Dept. 1981) (where act of legal malpractice took place outside New York and caused financial loss in New York, "it cannot be said that injury was sustained in New York"). Mr. Pivar's case is like these cases in the relevant respects. He alleges that the Museum acted negligently in the Netherlands in preparing its report, and that as a result, he suffered an intangible financial loss in New York that he would have suffered in whatever state he happened to be domiciled. Thus § 302(a)(3) does not support jurisdiction.

2. <u>Jurisdiction Is Improper Under The Due Process Clause.</u>

The due process analysis requires the Court first to evaluate the quality and nature of the Museum's contacts with New York in the totality of the circumstances. Personal jurisdiction comports with due process only where the defendant "purposefully availed itself of the privilege of doing business in the forum and could foresee being haled into court there." *Charles Schwab Corp. v. Bank of Am. Corp.,* 883 F.3d 68, 82 (2d Cir. 2018) (citation and internal quotation marks omitted). If Mr. Pivar can make that showing, the Court must next consider the contacts between the Museum and New York "in light of other factors to determine whether the assertion of personal jurisdiction would comport with fair play and substantial justice." *Id.*

a. <u>The Museum Did Not Purposefully Avail Itself of the Privilege of Doing Business In New York.</u>

Because purposeful availment is a requirement under both the long-arm statute and the Due Process clause, the discussion above applies here with equal force. *See Licci,* 732 F.3d at 170 (only rarely will New York transaction of business requirement be satisfied if purposeful availment for constitutional purposes is not). It was Mr. Pivar who sought out the Museum, and

not vice versa. The Museum responded to his communications and invited him to submit a request for authentication with his consent to the Museum's General Terms and Conditions. The General Terms and Conditions could not have made more plain the Museum's intention *not* to avail itself of the privilege of doing business in New York. The Museum refused to authenticate Mr. Pivar's painting until Mr. Pivar agreed that his relationship with the Museum would not be governed by New York law but by Dutch law, and that any disputes with the Museum would not be heard in New York but in the Netherlands. The Museum did nothing in New York, and its only connections to New York occurred when it responded to Mr. Pivar's emails, asked him to submit his signed authentication request to the Museum in Amsterdam, and sent Mr. Pivar, privately, its report.

        b.      <u>The Assertion of Jurisdiction Does Not Comport With Fair Play and Substantial Justice.</u>

If the Court finds, contrary to the arguments above, that the Museum did purposefully avail itself of the privilege of doing business in New York, then it must consider whether the assertion of jurisdiction would comport with fair play and substantial justice and is therefore reasonable under the Due Process Clause. *See Chloe v. Queen Bee of Beverly Hills, LLC,* 616 F.3d 158, 172-73 (2d Cir. 2010). The Court should consider (1) the burden on the Museum, (2) the interests of New York, (3) Mr. Pivar's interest in obtaining relief, and (4) the needs of the interstate judicial system in obtaining efficient resolution of controversies; and the shared interests of states in furthering fundamental substantive social policies. *See id.* at 173 (citing *Asahi Metal Indus. Co. v. Super. Ct. of Cal.,* 480 U.S. 102, 113 (1987)). The Court must also carefully consider "the procedural and substantive policies of other *nations* whose interests are affected by the assertion of jurisdiction by the [New York] court." *Asahi,* 480 U.S. at 115.

There do not appear to be any New York state interests in fundamental substantive social policies in this diversity action for breach of contract and negligence, nor does interstate efficiency have much weight, since the choice of forum clause mandates litigation of all claims in the Dutch forum. The Dutch state has an interest here, insofar as the Museum is a formerly state-owned institution that is still state-subsidized and that houses a state-owned collection.

On the one hand, Mr. Pivar has an interest in obtaining relief in a forum convenient for him, and thus the third factor favors Mr. Pivar. But the burden on the Museum is a significant factor here, because the Museum is not just seeking to avoid litigation in New York, but to avoid litigation in a multiplicity of jurisdictions, especially since it offers its authentication services without charge. Especially given the parties' agreement on a Dutch forum, which was an absolute condition of the Museum agreeing to undertake the work Mr. Pivar wanted it to do without pay, the burden on the Museum, together with the Dutch interest, carries the most weight. Bearing in mind that Mr. Pivar has a greater interest than the plaintiff had in *Asahi,* this case is a classic example of one where the "international context, the heavy burden on the alien defendant, and the slight interests of … the forum State" make the exercise of jurisdiction "unreasonable and unfair." *Asahi,* 480 U.S. at 115.

CONCLUSION

Because the parties agreed that all disputes would be litigated in the Netherlands, and

because the Court lacks jurisdiction over the Museum, the Court should dismiss the action.


Dated: December 21, 2021                    Respectfully submitted,

                                            */s/ Theodore J. Folkman*

                                            **FOLKMAN LLC**

                                            Theodore J. Folkman (pro hac vice)
                                            53 State St., Suite 500
                                            Boston, MA 02109
                                            Tel. (617) 219-9664
                                            Fax (857) 336-0206
                                            ted@folkman.law

                                            **STONE LAW GROUP PLLC**
                                            Ralph M. Stone (RS-4488)
                                            1700 Broadway, 41st Floor
                                            New York, NY 10019
                                            Tel. (212) 292-5690
                                            Fax (212) 292-5680

                                            *Attorneys for the Defendant*

23

CERTIFICATE OF SERVICE

I certify that on December 21, 2021, I served the foregoing document by first-class mail, postage prepaid, on counsel of record for the plaintiff.

*/s/ Theodore J. Folkman*