UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| STUART PIVAR,<br><br>　　　　　Plaintiff,<br><br>vs.<br><br>THE VAN GOGH MUSEUM,<br><br>　　　　　Defendant | Civ A No. 1:21-cv-09326 |

## **DECLARATION OF MARIJE VELLEKOOP**

I, Marije Vellekoop, make the following declaration.

1.　　I am the Senior Manager of Collections at the Van Gogh Museum. I have held that position since December 2020. and have worked at the Museum since 1995. From 1999 to 2013, I served as Curator of Prints and Drawings, and from 2013 to the present I have led the Department of Collections and Research. I make this declaration on my own personal knowledge.

2.　　Formerly a state museum, the Van Gogh Museum is now operated by the Van Gogh Museum Foundation.

3.　　Today, the Museum welcomes millions of visitors each year. It is home to the world's largest collection of Van Gogh's works, including more than 200 paintings, 500 drawings, and more than 800 letters. The Museum still houses and displays a state-owned collection in addition to its main collection, which is owned by the Vincent Van Gogh Foundation, and it is still state-subsidized.

1

4. The Museum is deeply engaged in authenticity research. The Department of Collections and Research is responsible for this research, and because I led the department for approximately nine years, I have knowledge of the rules governing authentication requests and the Museum's procedures and practices concerning authentication.

5. We receive hundreds of requests each year seeking an opinion regarding the authenticity of works attributed by their owners to Van Gogh. The Museum provides its opinion on authenticity to art owners around the world free of charge (in some cases, where technical research is needed that the Museum itself cannot perform, the Museum may charge for additional research costs or expenses, but that did not happen in Mr. Pivar's case). In all cases, we ask art owners to provide photographs of the work in question and information on provenance. Only occasionally do we request that the owners send the work itself to the Museum for a more detailed examination.

6. When the Museum's researchers are of the opinion, based on the photographs, that an artwork is not by Van Gogh, the Museum usually does not provide a detailed substantiation of the researcher's findings, although the Museum did provide a detailed report in Mr. Pivar's case. Based on my education and experience in art history, I know that the practice of determining that an artwork is not authentic based only on photographs and documents is not uncommon in the field. The Museum has always endorsed this practice, and in my opinion rightly so.

7. Rarely, the Museum does authenticate an unknown artwork as a work of Vincent Van Gogh. For example, in 2020 the Museum authenticated *Self Portrait (1889).* But authentication of an unknown work as a Van Gogh is an exceptional and rare occurrence.

8. The Museum first learned of Mr. Stuart Pivar and the painting he believed was a work of Van Gogh in April 2021. At that time, we received an unsolicited email from Constance Schwartz, director emerita of the Nassau County Museum of Art in the United States. A true copy of the email is attached to this Declaration as Exhibit 1. Ms. Schwartz indicated that an unnamed collector had lent the painting to her museum, which planned to exhibit it.

9. Two days later Mr. Pivar himself sent an unsolicited email to the Museum indicating that he was the owner of the painting Ms. Schwartz had written about. A true copy of Mr. Pivar's email is attached to this Declaration as Exhibit 2.

10. Several days letter, the Department of Collections and Research responded to Ms. Schwartz and Mr. Pivar. A true copy of the response is attached to this Declaration as Exhibit 3. The response indicated that due to the COVID-19 pandemic, the Museum was closed and was not accepting authentication request, although the Museum did advise Mr. Pivar to make an authentication application if it wanted to have the Museum's opinion regarding authenticity of the work. Ordinarily, the Museum makes it possible for owners to apply for authentication services via its website. But from March 2020 to September 2021, because the Museum was not accepting authentication requests, it modified its website so that web users could not submit applications via the web.

11. Mr. Pivar responded that he had apprised the Museum of the existence of the painting "merely for … edification." He wrote that he did not seek the Museum's opinion as to authenticity, because he had already conducted and published his own investigation. A true copy of Mr. Pivar's response is attached to this Declaration as Exhibit 4.

12. A few days later, my colleague Teio Meedendorp received an unsolicited email from Howard Shaw, a New York art dealer apparently writing on behalf of a friend of Mr. Pivar.

3

A true copy of the email is attached to this Declaration as Exhibit 5. Mr. Meedendorp shared the email with me at the time.

13. Mr. Meedendorp responded that the Museum had already corresponded with Mr. Pivar, but that rather than seeking the Museum's opinion as to authenticity, Mr. Pivar had simply gone public with his claims. Nevertheless, Mr. Meedendorp suggested that Mr. Shaw should tell his friend that Mr. Pivar could submit an application for authentication to the Museum. A true copy of Mr. Meedendorp's email is attached to this Declaration as Exhibit 6.

14. A true copy of Mr. Shaw's response to Mr. Meedendorp is attached to this Declaration as Exhibit 7.

15. Very shortly thereafter, Mr. Pivar sent an unsolicited message to the Museum, via his assistant, indicating that he planned to ship the painting to the Museum for its review. A true copy of Mr. Pivar's email is attached to this Declaration as Exhibit 8. My impression was that either Mr. Shaw and his friend had not accurately conveyed the Museum's message to Mr. Pivar or that Mr. Pivar had heard what he wanted to hear. To be clear, neither the Museum nor any of its personnel, including its director (Emilie Gordenker, who has been director since early 2020), ever asked Mr. Pivar to send the painting to Amsterdam. Indeed, all of our communications made it clear that he should not send the painting.

16. Mr. Pivar followed up with another unsolicited message, which again suggested that he was planning to ship the painting to the Museum; he asked the Museum to confirm that it wanted to receive the painting. A true copy of Mr. Pivar's email is attached to this Declaration as Exhibit 9.

17. The Museum responded with an email indicating that although the Museum was not handling authentication requests during the pandemic, it would make an exception for Mr.

4

Pivar, provided that he would sign and return a written agreement to be bound by the Museum's terms and conditions. A true copy of the email is attached to this Declaration as Exhibit 10. The Museum always, without exception, insists on having the owner's agreement to the terms and conditions before proceeding. The email made it clear that Mr. Pivar should not send the painting without an invitation.

18. Mr. Pivar returned the signed agreement the same day. A true copy of the email attaching the signed agreement is attached to this Declaration as Exhibit 11. I have reviewed the version of the signed agreement attached as an exhibit to Mr. Pivar's complaint, which differs from the version he sent to the Museum in minor respects, including the date. I have reviewed the Museum's files and can find no record that the Museum ever received the version of the document Mr. Pivar has included with his complaint. I am confident that the Museum never received it.

19. Mr. Pivar also sent the Museum digital images of the painting and additional information concerning its provenance. For example, Mr. Pivar wrote that he had "evidence that *Auvers, 1890* was in the collection of Curt Glasser." A true copy of that communication is attached to this Declaration as Exhibit 12. Later, Mr. Pivar wrote that his "previous account of the provenance of Auvers, 1890, was based on misinformation," and that in fact it was part of a collection of paintings that was likely exported from Nazi Germany or Nazi-occupied Europe, "as most are stamped verso with the same Nazi governmental export seal." A true copy of the second communication is attached as Exhibit 13. Mr. Pivar also asserted that "the painting is part of a collection exported by a Jewish collector under Nazi authority, likely under duress." The reference to a "Jewish collector" was a reference to Jonas Netter. A true copy of that communication is attached to this Declaration as Exhibit 14. The Museum's report, discussed

below, suggested that the Nazi stamps might be inauthentic and that it was unlikely the painting was in the Netter collection. Mr. Pivar later acknowledged that the Nazi stamps were, in his words, "bogus." A true copy of Mr. Pivar's email is attached to this Declaration as Exhibit 15.

20. The Museum issued its report to Mr. Pivar in July 2021. A true copy of the report and the correspondence that accompanied it is attached to this Declaration as Exhibit 16.

21. Mr. Pivar promptly demanded that the Museum withdraw its report and threatened a billion-dollar lawsuit in an American court. A true copy of the threat is attached to this Declaration as Exhibit 17.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on December 21, 2021.

Marije Vellekoop

<u>CERTIFICATE OF SERVICE</u>

I certify that on December 21, 2021, I served the foregoing document by first-class mail, postage prepaid, on counsel of record for the plaintiff.

*/s/ Theodore J. Folkman*