UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| STUART PIVAR, | |
| Plaintiff, | Civ A No. 1:21-cv-09362-LLS |
| vs. | |
| THE VAN GOGH MUSEUM, | |
| Defendant | |

## REPLY IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS

**FOLKMAN LLC**

Theodore J. Folkman (pro hac vice)
53 State St., Suite 500
Boston, MA 02109
Tel. (617) 219-9664
Fax (857) 336-0206
ted@folkman.law

**STONE LAW GROUP PLLC**
Ralph M. Stone (RS-4488)
1700 Broadway, 41st Floor
New York, NY 10019
Tel. (212) 239-1550
Fax (212) 292-5680
rs@stonepllc.com

*Attorneys for the Defendant*

Dated: February 9, 2022

TABLE OF CONTENTS

Table of Authorities ................................................................................................................. ii

   A.   Mr. Pivar Misstates The Facts. ...................................................................................... 1

   B.   The Contract Is Not A Contract of Adhesion. ................................................................ 4

   C.   The Contract Is Not Unconscionable. ............................................................................ 5

      1.   The Contract Was Not Procedurally Unconscionable. ...................................... 7

      2.   The Contract Was Not Substantively Unconscionable. ..................................... 8

      3.   The Netherlands Is Not A Seriously Inconvenient Forum. ................................ 9

   D.   The Court Lacks Personal Jurisdiction. ......................................................................... 9

TABLE OF AUTHORITIES

Cases

*AXA Versicherung AG v. N.H. Ins. Co.,* 391 Fed. App'x 25 (2d Cir. 2010) .................................. 7

*Deutsche Bank Secs., Inc. v. Mont. Bd. of Invs.,* 7 N.Y.3d 65 (2006) ......................................... 10

*Gillman v. Chase Manhattan Bank,* 73 N.Y.2d 1 (1988) ............................................................. 4

*Horvath v. Banco Comercial Portugues, SA,* 461 Fed. App'x 61 (2d Cir. 2012) ...................... 6, 7

*Lease Finance Group, LLC v. Indries,* 2015 N.Y. Misc. LEXIS 4483 (Civ. Ct. Dec. 9, 2015)..... 8

*Molino v. Sagamore,* 105 A.D.3d 922 (2d Dept. 2013)................................................................. 5

*Phillips v. Audio Active, Ltd.,* 494 F.3d 378 (2d Cir. 2007) ...................................................... 6, 7

*Simar Holding Corp. v. GSC,* 87 A.D.3d 688 (2d Dept. 2011) ..................................................... 8

*Universal Grading Serv. v. eBay, Inc.,* 2009 U.S. Dist. LEXIS 49841 (E.D.N.Y. Jun. 9, 2009)... 8

*Vargas Realty Enters. v. CFA W. 11 St., LLC,* 440 B.R. 224 (S.D.N.Y. 2010)............................. 5

*Warburg, Pincus Equity Partners, LP v. Keane,* 22 A.D. 321 (1st Dept. 2005) ........................... 7

*Weidman v. Tomaselli,* 81 Misc. 2d 328 (Co. Ct.), *aff'd* 84 Misc. 2d 782 (App. Term. 1975)...... 5

Statutes

28 U.S.C. § 1746.......................................................................................................................... 1

C.P.L.R. § 302(a)(1) ..................................................................................................................... 9

Other Authorities

Anthony Haden-Guest, *Stuart Pivar Found a Vincent Van Gogh While On One Of His Periodic
    Art Hunts in America,* Whitehot Magazine, May 2021, *available at*
    https://whitehotmagazine.com/articles/periodic-art-hunts-in-america/4970 ........................... 4

Mara Siegler, *Art Collector Says Van Gogh Authenticators Are Wrong,* New York Post, Sept. 8,
    2021, *available at* https://nypost.com/2021/09/08/art-collector-says-van-gogh-authenticators-
    are-wrong/ ................................................................................................................................ 3

Mr. Pivar's memorandum does not come to grips with the law on forum selection clauses. Instead, he makes a perfunctory and meritless argument that the contract between him and the Museum is an unenforceable contract of adhesion or is unconscionable under New York law. Nor does he make any argument that the Museum's few contacts with New York that are relevant to his case are sufficient to establish jurisdiction. Instead, he points to contacts having nothing to do with the contract or the supposed breach to make his case, even though he acknowledges that only contacts sufficiently related to the claim are relevant.

In this reply, the Museum shows that Mr. Pivar's arguments fail. It also shows that his arguments rely on plain and inexcusable misstatements of the facts. In light of the true facts and the undisputed law, the Court should grant the Museum's motion to dismiss for *forum non conveniens* and for lack of jurisdiction.

A.       Mr. Pivar Misstates The Facts.

Mr. Pivar's memorandum is replete with statements of fact that are not supported by any evidence. He claims, for example, that the Museum "has a monopoly on the market for Van Gogh scholarship and authentication" (Mem. at 5), a point he thinks is relevant to his argument that the contract between him and the Museum was unconscionable. The claim is obviously false. In May 2021, Mr. Pivar wrote that he did not want the Museum's opinion because "[w]e have conducted and published our own investigations on this unique work …" (Vellekoop Decl. Ex. 4).[1] Mr. Pivar had obtained an opinion from Michael P. Mezzatesta, Ph.D., the director emeritus of the Duke University Art Museum, in April 2021 to the effect that the painting was "instantly recognizable as the work of van Gogh" after "inspection of the high-resolution

---

[1] Mr. Pivar is of course wrong to claim (Mem. at 7) that the Court cannot consider the declarations submitted in support of the Museum's motion because they are not sworn before a notary. *See* 28 U.S.C. § 1746.

images" he was sent. (Vellekoop Decl. Ex. 5 at 15). So there is no doubt that there are others engaged in the work of opining on whether artworks can be attributed to Van Gogh.

Mr. Pivar also asserts that the Museum "lends artwork worldwide on a regular and routine basis and that includes loans to New York institutions" (Mem. at 5), which he thinks is relevant to his personal jurisdiction arguments.[2] But he offers no evidence to support this broad assertion. The only example relating to New York he mentions is a single loan of artworks in 2007 and 2008 to the Morgan Library and Museum. (Mem. at 8-9).

In fact, paintings ordinarily displayed in the Museum *were* displayed approximately fifteen years ago at the Morgan as part of its "Painted With Words" exhibition. These paintings are part of the Museum's main collection and are owned not by the Museum (that is, the Van Gogh Museum Foundation, the entity that contracted with Mr. Pivar and that he sued), but by an independent foundation, the Vincent Van Gogh Foundation. The Vincent Van Gogh Foundation, unlike the Museum, is managed by members of the Van Gogh family. It owns much of the art displayed in the Museum (Vellekoop Decl. ¶ 3; Meerdink-Schenau Decl. ¶ 2).[3] It was the Vincent Van Gogh Foundation, not the Museum, that loaned the works to the Morgan. (Meerdink-Schenau Decl. ¶ 3).

Mr. Pivar also asserts that the Morgan's online gift shop "features three items for sale in New York" (two tote bags and a tray) that "reproduce works of art by Van Gogh held in the permanent collection of the defendant." (Mem. at 9). Van Gogh died in 1890, his work is no longer subject to copyright. In any event, the evidence Mr. Pivar offers affirmatively shows that none of the three items are available for sale: all three webpages read, "Product not available."

---

[2] Similarly, he asserts that the Museum "routinely and regularly lends artwork from its collection to exhibits in New York …" (Mem. at 8).
[3] The Musuem also houses a collection of state-owned art. (Vellekoop Decl. ¶ 3).

(Cantor Aff. Ex. 1). Mr. Pivar provides no evidence that even a single item was sold in New York or that any of the items were actually available for purchase in New York or anywhere else at any time. The webpage describing the "Van Gogh The Bedroom Mini Metal Tray" makes no mention of the Museum, has no connection to the Museum (Meerdink-Schenau Decl. ¶ 4), and has no apparent bearing on Mr. Pivar's arguments. With respect to the two tote bags, the Museum licensed the use of its "Van Gogh Museum" trademark and advanced digital photographs of the artwork to VGME, B.V. a subsidiary, which in turn licensed the name to a German manufacturer that provided the bags to the Morgan. (Meerdink-Schenau Decl. ¶ 5). So the Museum had no direct dealings with the Morgan with respect to the two items, and even if the distinction between the Museum and its subsidiary, VGME, were ignored, at most, the Museum licensed its name to a non-New York manufacturer to be used in connection with two tote bags, and there is no evidence that either bag was ever sold or even available for sale.

Mr. Pivar wrongly asserts that the Museum has "a collection worth several billion dollars" in order to try to illustrate a supposed disparity in bargaining power.  (Mem. at 6). This is untrue, because as already noted, the Museum does not own the vast majority of the artwork it displays (Meerdink-Schenau Decl. ¶ 7). In any event, Mr. Pivar cannot hope to establish an imbalance of resources without providing any evidence about his own resources. Pivar himself says he owns an "extensive, varied and very valuable collection of fine paintings and sculpture" (Mem. at 4). If, as has been reported, his art collection "includes paintings by Raphael, Rembrandt, Rubens, Velazquez, Goya, and Picasso, among others," *See* Mara Siegler, *Art Collector Says Van Gogh Authenticators Are Wrong,* New York Post, Sept. 8, 2021, *available at* https://nypost.com/2021/09/08/art-collector-says-van-gogh-authenticators-are-wrong/, then some explanation of any supposed imbalance is in order.

Finally, Mr. Pivar's characterization of himself as a homebound nonagenarian who could not possibly litigate his claim in the Netherlands, even if true today, was surely untrue at the time he made the contract, which is the relevant time for deciding unconscionability. *Gillman v. Chase Manhattan Bank,* 73 N.Y.2d 1, 10 (1988) (unconscionability "generally requires a showing that the contract was both procedurally and substantively unconscionable *when made*") (emphasis supplied). Mr. Pivar claims he found *Auvers, 1890* in March 2021. (Ver. Compl. ¶ 3). Here is how Mr. Pivar described his art collecting process in a May 2021 interview:

> There are places where the detritus of the buy-ins, the turn-downs are accumulated by certain people. And I know who some of them are. Because I spend much of my time ... the reason I have so much stuff, and nobody else has, is because I show up, I track down things and look at obscure everythings. I do that a lot.

Anthony Haden-Guest, *Stuart Pivar Found a Vincent Van Gogh While On One Of His Periodic Art Hunts in America,* Whitehot Magazine, May 2021, *available at* https://whitehotmagazine.com/articles/periodic-art-hunts-in-america/4970. And a plaintiff who sends an email such as Mr. Pivar's email of August 15, 2021 (Vellekoop Decl. Ex. 17), two days after receiving the Museum's report on his painting and just two weeks before the date on his verified complaint, threatening that his attorneys will file a billion-dollar lawsuit if the Museum refuses to accede to his demands can hardly be seen as someone incapable of withstanding the rigors of a litigation that he himself commenced.

B.      The Contract Is Not A Contract of Adhesion.

Mr. Pivar argues that the contract is a "classic contract of adhesion" (Mem. at 6). He cannot possibly succeed on that theory, since a contract of adhesion is, by definition, a contract involving "a necessity of life," which gives "an excessive benefit" to the offeror, in a situation where the offeror has an "economic or other advantage" over the other party, and the contract is offered on a "take-it-or-leave-it" basis. *See Vargas Realty Enters. v. CFA W. 11 St., LLC,* 440

4

B.R. 224, 237 (S.D.N.Y. 2010) (citing *Weidman v. Tomaselli,* 81 Misc. 2d 328 (Co. Ct.), *aff'd* 84

Misc. 2d 782 (App. Term. 1975)). Here, the contract was indeed a take-it-or-leave-it contract, but

obtaining a museum's opinion on the authenticity of a work purportedly painted by Vincent Van

Gogh is not a necessity of life. There was no benefit to the Museum itself let alone an excessive

benefit; the Museum provides a service to the public free of charge and insists on agreement to

its General Terms and Conditions only to protect itself from lawsuits such as the lawsuit Mr.

Pivar has brought in foreign jurisdictions. Nor did the Museum have any economic advantage

over Mr. Pivar.

In the case Mr. Pivar cites on contracts of adhesion, *Molino v. Sagamore,* 105 A.D.3d

922 (2d Dept. 2013), a hotel guest signed a rental agreement that contained a choice of forum

clause requiring all disputes with the hotel to be brought in Warren County. The guest tripped

and fell and was injured, and she sued in Queens County. While the Supreme Court denied the

hotel's motion to transfer venue on the grounds that the contract was one of adhesion, the

Appellate Division reversed. "[A] form agreement such as the Rental Agreement here is not

automatically one of adhesion because such claims are judged by whether the party seeking to

enforce the contract has used high pressure tactics or deceptive language in the contract and

whether there is inequality of bargaining power between the parties." *Id.* at 922 (citation and

internal quotation marks omitted). "The fact that the Rental Agreement containing the forum

selection clause was presented to the plaintiffs at registration and was not the product of

negotiation does not render it unenforceable." *Id.* The same is true here.

C.    The Contract Is Not Unconscionable.

Mr. Pivar claims that he should not be bound by the General Terms and Conditions, even

though the document he signed expressly incorporated them by reference and even though the

Museum emailed him a copy of them at the same time it emailed him the document for signature.

5

(Vellekoop Decl. Ex. 10). This argument runs afoul of *Phillips v. Audio Active, Ltd.,* 494 F.3d 378 (2d Cir. 2007), which merely requires that the clause be "reasonably communicated to the party resisting enforcement" and that it not be the product of fraud or overreaching. *See id.* at 383-84, 392.[4] Here, there can be no argument about the way the Museum made Mr. Pivar aware of the General Terms and Conditions. It emailed them to him at the same time it emailed the document that incorporated them by reference. (Vellekoop Decl. Ex. 10).

Mr. Pivar claims (Pivar. Aff. ¶ 4) that he was unaware of the forum selection clause in the General Terms and Conditions when he agreed to them. He also says his eyesight is "not as acute it was previously" (Pivar Aff. ¶ 3), suggesting without asserting that he could not have read the General Terms and Conditions if he had tried.[5] But there is no question that Mr. Pivar signed the contract. The case is like *Horvath v. Banco Comercial Portugues, SA,* 461 Fed. App'x 61 (2d Cir. 2012), in the relevant respects. There, a customer of an investment brokerage signed a form that incorporated by reference the firm's general terms and conditions. Unlike the Museum's General Terms and Conditions, which are in English, the firm's general terms and conditions were in Portuguese, and the customer, unlike Mr. Pivar, claimed he never received them. The court rejected the customer's argument that the forum selection clause in the general terms and conditions were unenforceable:

---

[4] As explained in the opening memorandum, *Phillips* also asks whether the foreign law would be "fundamentally unfair," whether enforcement of the clause would contravene a "strong public policy," and whether trial in the Netherlands would be so difficult that Mr. Pivar would effectively be deprived of his day in court. *See Phillips,* 494 F.3d at 392. Mr. Pivar makes no argument that Dutch law is unfair or that enforcement of the forum selection clause contravenes public policy. We discuss the supposed inconvenience of trial in the Netherlands below.

[5] Mr. Pivar's insistence (Pivar Aff. ¶ 6) that he does not recall reading the General Terms and Conditions might be true as far as it goes, but either he or someone working for him read the documents and highlighted the words "General Terms and Conditions" on the copy of the contract he attached to his complaint (Compl. Ex. A), and highlighted several key provisions of the General Terms and Conditions themselves (Compl. Ex. B). Moreover, the choice of law and forum selection clauses in the General Terms and Conditions are presented using the same typeface as all the other terms and are not buried in fine print.

> Absent substantive unconscionability or fraud of a type not alleged here, parties are charged with knowing and understanding the contents of documents they knowingly sign.

*Id.* at 63. The court quoted *AXA Versicherung AG v. New Hampshire Insurance Co.,* 391 Fed.

App'x 25, 30 (2d Cir. 2010), where the court observed:

> If the signer could read the instrument, not to have read it was gross negligence; if he could not read it, not to procure it to be read was equally negligent; in either case, the writing binds him.

The same reasoning applies here. Especially because the Museum gave him straightforward

notice of the terms of the contract, Mr. Pivar is bound by them.

Even if, as Mr. Pivar assumes without any argument, New York law rather than *Phillips*

applies, his unconscionability argument has no merit. Unconscionability generally requires a

showing that the party asserting it had no choice but to enter into the agreement ("procedural

unconscionability"), and that the terms of the contract unfairly favor the other party ("substantive

unconscionability"). *See Warburg, Pincus Equity Partners, LP v. Keane,* 22 A.D. 321, 322 (1st

Dept. 2005). Neither showing is possible here.

      1.     <u>The Contract Was Not Procedurally Unconscionable.</u>

First, Mr. Pivar did not have to sign the agreement, even assuming he needed the opinion

of an expert regarding the authenticity of his painting. He was able to, and did, obtain an opinion

regarding authenticity from Dr. Mezzatesta. And of course it is a mistake to speak of "need" or

lack of choice in the context of this case. No one *needs* to have the Museum's opinion or

anyone's opinion about the authenticity of a work of art. There were no high-pressure

commercial tactics, inequality of bargaining power, deception, or imbalance in the acumen of the

7

parties, which are the hallmarks of procedural unconscionability mentioned in one of the cases

Mr. Pivar cites, *Simar Holding Corp. v. GSC,* 87 A.D.3d 688, 689-90 (2d Dept. 2011).[6]

The court rejected an argument, similar to Mr. Pivar's, that a forum selection clause was

procedurally unconscionable in *Universal Grading Service v. eBay, Inc.,* 2009 U.S. Dist. LEXIS

49841 (E.D.N.Y. Jun. 9, 2009). There, the plaintiffs had asserted that the forum selection clause

in eBay's user agreement was unconscionable and therefore unenforceable because the plaintiffs

"had no choice but to accept the forum selection clause." The court held:

> the mere fact that plaintiffs were required to accept a form agreement drafted by … eBay in order to use … eBay's services does not render the terms of that agreement procedurally unconscionable. An agreement cannot be considered procedurally unconscionable, or a contract of adhesion, simply because it is a form contract.

Id. at *63. The same is true here. Nothing forced Mr. Pivar to agree to the Museum's terms. He

agreed because he wanted to use the Museum's services, which unlike eBay's are offered free of

charge.

2.      The Contract Was Not Substantively Unconscionable.

Nor could Mr. Pivar possibly show substantive unconscionability. There are cases where

a forum selection clause is substantively unconscionable. For example, in *Lease Finance Group,*

*LLC v. Indries,* 2015 N.Y. Misc. LEXIS 4483 (Civ. Ct. Dec. 9, 2015), the court held that where

the defendant was an uneducated immigrant living in California whose first language was not

English, and where the plaintiff's claim was for $2,600 under an equipment lease, requiring the

defendant to travel to New York to defend the case would be substantively unconscionable.

Here, Mr. Pivar is an obviously sophisticated businessman and litigant, the amount in

---

[6] It is noteworthy that in *Simar,* the court reversed a finding that a contract was procedurally unconscionable, holding that the plaintiff had failed to prove that she suffered from a psychiatric disorder that led to an imbalance in the understanding and acumen of the parties. *Id.* at 690-91.

controversy is hundreds of millions of dollars, and Mr. Pivar is not the defendant but the plaintiff. The Museum, for its part, had no commercial motive for entering into the contract and indeed receives nothing under the contract. The purpose of the forum selection clause was not to win cheap victories over consumers who cannot afford to defend themselves away from home, but purely defensive—to avoid situations like the one that Mr. Pivar has created, where the Museum, after providing its services free of charge, gets haled into court in an expensive foreign jurisdiction by a disappointed art owner.

3.      The Netherlands Is Not A Seriously Inconvenient Forum.

Mr. Pivar complains, in general terms, that travel to the Netherlands would be burdensome for him given his age and his health. (Pivar Aff. ¶ 2). He ignores the uncontroverted evidence that his physical presence would likely not be required, and that the Dutch courts generally make it possible for witnesses and litigants to appear remotely. (Van Der Plas Decl. ¶ 13).

D.      The Court Lacks Personal Jurisdiction.

Mr. Pivar's argument that the Museum transacted business in New York sufficient to bring the case with C.P.L.R. § 302(a)(1) cannot possibly succeed. He implicitly acknowledges that none of the Museum's contacts with New York that are relevant to his case, which the Museum addressed in its opening memorandum, are sufficient to show jurisdiction, and he instead points to supposed contacts that are irrelevant to his case. He recognizes the problem with his own argument: "It is admitted," he writes, "that CPLR 302(a)(1) also requires that the claim 'arise' from the acts that constituted the transaction of business upon which jurisdiction is grounded." (Mem. at 10). Here, the acts on which Mr. Pivar grounds jurisdiction are the loan of paintings to a New York museum in 2007 and 2008, and the sale of a handful of gift items on that museum's website that are said to have some connection to the Museum. We have shown

above that the facts do not support Mr. Pivar's assertions about the Museum's contacts with New York. The Museum did not lend the painting; there is no evidence that the products on the website have ever been sold or that they have ever been available for sale. But even if the facts were precisely as Mr. Pivar claims, the loan of the painting and the sale of the items via the New York museum's website have nothing whatever to do with the contract between Mr. Pivar and the Museum or the work the Museum did leading to the report that prompted Mr. Pivar's billion-dollar threat and this lawsuit.

*Deutsche Bank Securities, Inc. v. Montana Board of Investments,* 7 N.Y.3d 65 (2006), a case Mr. Pivar cites, illustrates the kind of nexus between New York contacts and the claim in a lawsuit that can support jurisdiction. There, Deutsche Bank and the Board of Investments had a year-long history of bond transactions, with a face value of over $100 million. The transactions were negotiated between the Board's representative, in Montana, and Deutsche Bank's representative, in New York. Deutsche Bank reached out to the Board through the Bloomberg messaging system to ask if the Board was interested in entering into a swap arrangement. The Board at first declined, but then it sent a message to Deutsche Bank in New York, indicating it wanted to sell some bonds. The parties negotiated the details and eventually reached an agreement. Hours later, a news story caused the price of the bonds the Board had agreed to sell to increase substantially, and the Board informed Deutsche Bank that it was repudiating the deal. Deutsche Bank sued for breach of contract. Communications with New York in the course of negotiating a bond trade are obviously closely tied to a claim for breach of contract arising out of a repudiation of the same deal that the parties had negotiated.

There is nothing like that here. No negotiations took place in New York or elsewhere, and the Museum performed in the Netherlands, not New York. Mr. Pivar's claim is that the

Museum developed its reputation as a leading authority on the works of Van Gogh at least in part by exhibiting his works in New York and by selling merchandise relating to exhibitions in which it has participated. Therefore, he says, there is a sufficient nexus between a claim that the Museum breached its contract with Mr. Pivar by failing to authenticate his painting and the Museum's New York contacts. That is absurd, and Mr. Pivar offers no case on similar facts because there is none. On Mr. Pivar's theory, an architect who becomes well-regarded because he designs a celebrated building in New York but has no other New York connection, and whose fame leads to a commission in California, can be sued in New York if the California building he designs collapses due to a design defect. Moreover, Mr. Pivar provides no evidence tying the exhibition at the Morgan or the products displayed on its website to the Museum's reputation. Nor could he: it is absurd to claim that the Museum developed it reputation in the art history world because a painting owned by the Vincent Van Gogh Foundation was loaned to the Morgan for an exhibition or because the Morgan offered two tchotchkes on its website that made use of the Museum's name.

The Court should grant the Museum's motion to dismiss.

Dated:  February 9, 2022                    Respectfully submitted,

                                            */s/ Theodore J. Folkman*

                                            **FOLKMAN LLC**

                                            Theodore J. Folkman (pro hac vice)
                                            53 State St., Suite 500
                                            Boston, MA 02109
                                            Tel. (617) 219-9664
                                            Fax (857) 336-0206
                                            ted@folkman.law

                                            **STONE LAW GROUP PLLC**
                                            Ralph M. Stone (RS-4488)
                                            1700 Broadway, 41st Floor
                                            New York, NY 10019
                                            Tel. (212) 239-1550
                                            Fax (212) 292-5680
                                            rs@stonepllc.com

                                            *Attorneys for the Defendant*